Kate FRAZIER et al., Plaintiffs,
Appellants,

v.

FAIRHAVEN SCHOOL COMMITTEE
et al., Defendants, Appellees.

No. 01–1130.

United States Court of Appeals,
First Circuit.

Heard Nov. 5, 2001.

Decided Jan. 9, 2002.

Michael W. Turner for appellants.

Gerald Fabiano, with whom Pierce, Davis & Perritano, LLP was on brief, for appellees.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and LIPEZ, Circuit Judge.

SELYA, Circuit Judge.

This appeal requires us to decide three issues of first impression in this circuit. Answering a question that has divided our sister circuits, we hold that a plaintiff who alleges that local educational officials have flouted her right to a free and appropriate public education may not bring suit for money damages under 42 U.S.C. § 1983 without first exhausting the administrative process established by the Individuals with Disabilities Education Act (IDEA). We next conclude that same-sex discrimination is actionable under Title IX of the Educational Amendments of 1972 (although, due to shortcomings in the amended complaint, the district court's dismissal of that claim nonetheless must stand). Finally, we hold that the Family Educational Rights and Privacy Act (FERPA) does not confer a private right of action upon either an aggrieved student or her parents. The upshot is that we affirm the district court's dismissal of the plaintiffs' amended complaint.

## I. BACKGROUND

We approach this appeal mindful that we must accept as true all well-pleaded factual averments contained in the operative pleading (the plaintiffs' amended complaint) and indulge all reasonable inferences in favor of the pleading parties. *See Aulson v. Blanchard,* 83 F.3d 1, 3 (1st Cir.1996); *see also* Fed.R.Civ.P. 12(b)(6).

We start by identifying the principal players. The plaintiffs in this case are

Kate Frazier (a young woman alleged to suffer from learning disabilities) and her parents, Bradford and Judith Frazier. Their suit, commenced on January 15, 1999, grows out of Kate's matriculation at, and her troubled five-year odyssey through, high school in a bucolic southeastern Massachusetts community (the town of Fairhaven). The defendants are the Fairhaven School Committee, the superintendent of schools, the principal of Fairhaven High School, and two mid-level school administrators (a guidance counselor and a discipline matron).

The lower court has written a thoughtful, closely reasoned opinion in which it has catalogued the plaintiffs' allegations in considerable detail. *See Frazier v. Fairhaven Sch. Comm.*, 122 F.Supp.2d 104, 106–08 (D.Mass.2000). It would be pleonastic to repeat that recital here. Thus, we proceed directly to the issues that confront us, referring those who hunger for factual context to the district court's account.

Insofar as is pertinent here, the amended complaint asserts three claims arising under federal law: (1) a claim that the defendants frustrated Kate's right to a free and appropriate public education and, therefore, are liable for money damages under 42 U.S.C. § 1983; (2) a claim that the high school's discipline matron sexually harassed Kate during school hours and, therefore, that the defendants are liable for money damages under Title IX; and (3) a claim that the defendants infringed Kate's right to privacy anent her school records and, therefore, that they are liable for money damages under FERPA. After some preliminary skirmishing (not material here), the defendants moved to dismiss the amended complaint on the ground that it failed to state claims upon which relief

could be granted. Fed.R.Civ.P. 12(b)(6). The district court dismissed the federal claims with prejudice. *Frazier*, 122 F.Supp.2d at 111–14. At the same time, the court declined to exercise supplemental jurisdiction over the plaintiffs' state-law claims and dismissed those claims without prejudice. *Id.* at 114. This timely appeal ensued. In it, the plaintiffs challenge the lower court's disposition of the three federal claims,[1] but do not contest the dismissal of their state-law claims.

## II. THE IDEA–BASED SECTION 1983 CLAIM

■ The statutory engine that drives the plaintiffs' principal claim is 42 U.S.C. § 1983. This statute provides in pertinent part that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage ..., subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." Properly construed, section 1983 "supplies a private right of action against a person who, under color of state law, deprives another of rights secured by the Constitution or by federal law." *Evans v. Avery*, 100 F.3d 1033, 1036 (1st Cir.1996).

■ To maintain such a cause of action, a plaintiff first must allege official conduct, that is, the occurrence of some act or omission undertaken under color of state law. *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 253 (1st Cir. 1996). Here, the plaintiffs easily satisfy this requirement: the defendants are officials or employees of a public school system, and all of them admittedly were act-

---

**1.** To the extent that the amended complaint asserts other federal claims, they are patently insubstantial, not pursued on appeal, or both.

ing under color of Massachusetts law. The plaintiffs also must allege that the defendants' acts or omissions deprived them of a federally-secured right. *Baker v. McCollan,* 443 U.S. 137, 142, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *Nieves v. McSweeney,* 241 F.3d 46, 53 (1st Cir.2001). To meet this requirement, the plaintiffs posit that federal law guaranteed Kate a free and appropriate public education and that the defendants' actions deprived her of that entitlement.[2]

█ The plaintiffs' premise is sound: the IDEA guarantees a free and appropriate public education to all children with disabilities. 20 U.S.C. § 1400(d)(1)(A). To realize that promise, the IDEA imposes a set of procedural safeguards upon state and local educational agencies that receive federal grants earmarked for special education and related services. *See id.* §§ 1411, 1415. As a recipient of such federal funds, Fairhaven High School was bound by the statutory conditions that Congress attached to the grants. Since the IDEA violations alleged by the plaintiffs all transpired while Kate Frazier was a student attending Fairhaven High School, the plaintiffs have brought themselves within the IDEA's reach.

The plaintiffs' conclusion—that an IDEA violation can ground a section 1983 claim even without exhaustion of administrative remedies—is considerably more problematic. To address this aspect of the case, we must explore the anatomy of the IDEA. We then consider the necessity for exhaustion.

### A. The Statutory Scheme.

█ The IDEA is a comprehensive statutory scheme enacted by Congress "to en-

sure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services . . .; [and] that the rights of children with disabilities and parents of such children are protected." *Id.* § 1400(d)(1)(A)-(B). To that end, the IDEA provides that public school systems "shall establish and maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of free appropriate public education by such agencies." *Id.* § 1415(a). The IDEA contains a panoply of procedural safeguards designed to assure that parents will have meaningful input into decisions that affect the education of children with special needs. These include the right of parents to examine all records related to their child, to participate in meetings regarding the identification, evaluation, and educational placement of their child, to obtain an independent educational evaluation of their child, and to receive prior written notice whenever an educational agency proposes (or refuses) to change their child's placement or program. *Id.* § 1415(b).

The IDEA also provides parents with an opportunity to lodge formal complaints "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." *Id.* § 1415(b)(6). A complaining parent has recourse to an impartial due process hearing conducted by either the local or state educational agency (and if the hearing is conducted at the local level, the parent may then appeal to the state agency). *Id.* § 1415(f)-(g). In Massachu-

---

**2.** The plaintiffs do not allege violations of Title IX or FERPA as predicates for the section 1983 claim, but, rather, premise that claim exclusively upon the alleged deprivation of Kate's right to a free and appropriate public education. We evaluate their section 1983 claim accordingly.

setts, the Department of Education has created the Bureau of Special Education Appeals (BSEA) and empowered it to handle such appeals through mediations and hearings. *See* Mass. Regs.Code tit. 603, § 28.08.

■■■ The IDEA permits any party who is dissatisfied with the outcome of the due process hearing to bring suit in state or federal court. 20 U.S.C. § 1415(i)(2). But that right of action is carefully circumscribed. As a condition precedent to its exercise, an aggrieved party must satisfy the IDEA's exhaustion provision. This provision states that:

> Nothing in [the IDEA] shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, Title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under [subchapter II of the IDEA], the procedures under subsections (f) and (g) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

*Id.* § 1415(*l*). This requirement is not limited to claims based directly upon violations of the IDEA. The exhaustion principle "applies even when the suit is brought pursuant to a different statute so long as the party is seeking relief that is available under subchapter II of IDEA." *Rose v. Yeaw,* 214 F.3d 206, 210 (1st Cir.2000). Subchapter II of the IDEA includes, in pertinent part, the procedural safeguards set forth in section 1415.

■■■ The requirement that plaintiffs exhaust administrative remedies available under the IDEA is not absolute. For instance, "[a] plaintiff does not have to exhaust administrative remedies if she can show ... that the administrative remedies afforded by the process are inadequate given the relief sought." *Id.* at 210–11; *see also Honig v. Doe,* 484 U.S. 305, 327, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) (holding, under predecessor statute, that "parents may bypass the administrative process where exhaustion would be futile or inadequate"); 121 Cong. Rec. 37,416 (1975) (remarks of Sen. Williams) ("[E]xhaustion of the administrative procedures ... should not be required for any individual complainant filing a judicial action in cases where such exhaustion would be futile either as a legal or practical matter."). Nevertheless, the IDEA's exhaustion requirement remains the general rule, and a party who seeks to invoke an exemption bears the burden of showing that it applies. *See Honig,* 484 U.S. at 326–27, 108 S.Ct. 592.

■■■ The plaintiffs acknowledge that they have not pursued administrative remedies. They view this as inconsequential. Their argument for an exemption from the exhaustion requirement, adroitly distilled by the district court, *see Frazier,* 122 F.Supp.2d at 109, runs along the following lines. The amended complaint does not rely upon the IDEA, but, rather, upon 42 U.S.C. § 1983—and it seeks relief exclusively in the form of money damages. Seizing on the fact that the array of remedies available under the IDEA does not include money damages, *see Sellers v. Sch. Bd.,* 141 F.3d 524, 525 (4th Cir.1998); *Heidemann v. Rother,* 84 F.3d 1021, 1033 (8th Cir.1996); *Crocker v. Tenn. Secondary Sch. Athletic Ass'n,* 980 F.2d 382, 386 (6th Cir.1992), the plaintiffs argue that pursuing their claim through the IDEA's administrative process would be a waste of time. Rather, they should be allowed to forgo exhaustion and bring their section

1983 claim directly before a federal district court.

The defendants demur. They insist that the plaintiffs should be required to run the administrative gauntlet established by the IDEA to the same extent as if they originally had brought suit under that statute, notwithstanding that the plaintiffs seek only money damages. The defendants note that the statutory scheme hinges on facilitating the in-kind delivery of educational services, and warn that granting the plaintiffs' request would create an "opt-out" device, allowing future plaintiffs to bypass the IDEA's administrative procedures at will and to substitute monetary damages for the educational assistance that Congress intended to bestow upon handicapped children. The parties thus join issue: to exhaust or not to exhaust—that is the question.

### B. *The Necessity for Exhaustion.*

The question of whether a plaintiff who seeks only money damages is required to exhaust administrative remedies before instituting a section 1983 claim predicated on a violation of the IDEA is one of novel impression in this circuit. Five other courts of appeals previously have grappled with this question. Three of them have permitted plaintiffs who seek only money damages to proceed with their section 1983 claims without first exhausting the IDEA's machinery. *See Covington v. Knox County Sch. Sys.*, 205 F.3d 912, 917 (6th Cir.2000); *Witte v. Clark County Sch. Dist.*, 197 F.3d 1271, 1275 (9th Cir. 1999); *W.B. v. Matula*, 67 F.3d 484, 495–96 (3d Cir.1995). Two other courts have reached the opposite conclusion, holding squarely that plaintiffs may not bypass the IDEA's administrative process merely by limiting their prayers for relief to money damages. *See Charlie F. v. Bd. of Educ.*, 98 F.3d 989, 991–92 (7th Cir.1996); *N.B. v.*

*Alachua County Sch. Bd.*, 84 F.3d 1376, 1379 (11th Cir.1996) (per curiam).

In addressing this problem, we think that it is useful to reflect upon the general rationale that underlies exhaustion requirements in administrative regimes:

In the administrative state, exhaustion of administrative remedies is generally required. This requirement is more than a matter of form. Insisting on exhaustion forces parties to take administrative proceedings seriously, allows administrative agencies an opportunity to correct their own errors, and potentially avoids the need for judicial involvement altogether.

*P. Gioioso & Sons, Inc. v. OSHRC*, 115 F.3d 100, 104 (1st Cir.1997) (citations and internal quotation marks omitted). The IDEA fits comfortably into this general pattern. Congress constructed the law on the premise that plaintiffs would be "required to utilize the elaborate administrative scheme established by the [IDEA] before resorting to the courts to challenge the actions of the local school authorities." *N.B.*, 84 F.3d at 1378 (citation omitted). That makes sense because exhaustion "enables the [educational] agency to develop a factual record, to apply its expertise to the problem, to exercise its discretion, and to correct its own mistakes, and is credited with promoting accuracy, efficiency, agency autonomy, and judicial economy." *Christopher W. v. Portsmouth Sch. Comm.*, 877 F.2d 1089, 1094 (1st Cir.1989) (discussing predecessor statute).

Indeed, special benefits adhere to the exhaustion requirement in the IDEA context. The IDEA's administrative machinery places those with specialized knowledge—education professionals—at the center of the decisionmaking process, entrusting to them the initial evaluation of whether a disabled student is receiving a free, appropriate public education. These

administrative procedures also ensure that educational agencies will have an opportunity to correct shortcomings in a disabled student's individualized education program (IEP). *See Charlie F.,* 98 F.3d at 992 (explaining that an animating principle of the IDEA is that "educational professionals are supposed to have at least the first crack at formulating a plan to overcome the consequences of educational shortfalls"). This too makes sense because the problems attendant to the evaluation and education of those with special needs are highly ramified and demand the best available expertise.

■ The reliance of courts upon the detailed evidentiary record developed during the due process hearing further underscores the importance of the IDEA's administrative procedures. The statutory requirement that the reviewing court "shall receive the records of the administrative proceedings," 20 U.S.C. § 1415(i)(2)(B)(i), means that the court must give due weight to those proceedings. *See Bd. of Educ. v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) (decided under identically worded provision in predecessor statute). Put another way, the provision of judicial review is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Id.* Thus, judicial review in this type of case "falls well short of complete de novo review." *Lenn v. Portland Sch. Comm.,* 998 F.2d 1083, 1086 (1st Cir.1993). Allowing plaintiffs to bypass the IDEA's administrative process en route to state or federal court disrupts this carefully calibrated balance and shifts the burden of factfinding from the educational specialists to the judiciary. That phenomenon is directly at odds with the method of the IDEA: "[t]o allow parents to come directly to federal courts will render the entire scheme [of the IDEA] nugatory." *Crocker,* 873 F.2d at 935.

The plaintiffs concede these benefits—but they say that their value evaporates where, as here, a claimant seeks a remedy that the administrative machinery cannot provide. We do not agree. Exhaustion is beneficial regardless of whether the administrative process offers the specific form of remediation sought by a particular plaintiff. After all, the administrative process facilitates the compilation of a fully developed record by a factfinder versed in the educational needs of disabled children—and that record is an invaluable resource for a state or federal court required to adjudicate a subsequent civil action covering the same terrain. Fidelity to the IDEA's exhaustion requirement ensures such an outcome.

In concluding that exhaustion of administrative remedies is advantageous even though the administrative process does not offer the specific form of relief sought by the plaintiff, we find instructive a recent Supreme Court decision involving a different, but analogous, administrative exhaustion requirement. In *Booth v. Churner,* 532 U.S. 731, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001), an inmate at a Pennsylvania state prison claimed that guards had violated his Eighth Amendment rights by assaulting him and then withholding medical treatment. *Id.* at 1821. The applicable administrative grievance system, promulgated by Pennsylvania correctional authorities, did not provide for the recovery of money damages. *Id.* at 1821–22. Booth filed a grievance but, after prison officials rejected it, spurned administrative review, invoked 42 U.S.C. § 1983, and sued in the federal district court for money damages.

The district court dismissed the claim on the ground that Booth had failed to exhaust available administrative remedies as

required by the Prison Litigation Reform Act of 1995 (PLRA), Pub.L. No. 104–134, 110 Stat. 1321 (codified as amended in scattered sections of 18 U.S.C., 28 U.S.C., & 42 U.S.C.). The court of appeals affirmed, 206 F.3d 289 (3d Cir.2000), and the Supreme Court granted certiorari.

The crux of the controversy was the PLRA's exhaustion requirement, which provides that: "No action shall be brought with respect to prison conditions under section 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Booth implored the Court to rule that this requirement was inapposite because the administrative review process was not empowered to award the only form of relief that he sought—money damages. The Court refined the dispute to its bare essence: whether or not a remedial scheme was "available" where the administrative process "has authority to take some action in response to a complaint, but not the remedial action an inmate demands to the exclusion of all other forms of redress." *Booth,* 121 S.Ct. at 1822–23. The Court answered this question in the affirmative, concluding that a remedial scheme was "available" to Booth notwithstanding the inability of that scheme to yield an award of money damages. Justice Souter, writing for a unanimous Court, observed that:

> [T]he word "exhausted" has a decidedly procedural emphasis. It makes sense only in referring to the procedural means, not the particular relief ordered.... It makes no sense to demand that someone exhaust "such administrative [redress]" as is available; one "exhausts" processes, not forms of relief, and the statute provides that one must.

*Id.* at 1824. On this basis, the Court concluded that Congress had mandated exhaustion regardless of the particular relief offered (or not offered) through a given set of administrative procedures. *Id.* at 1825.

What the Court said of the PLRA's exhaustion language is equally true of the IDEA. The IDEA's exhaustion requirement mandates that "the procedures under subsection (f) and (g) of this section shall be exhausted." 20 U.S.C. § 1415(*l*). By adopting this particular phraseology, Congress unmistakably evinced its intent to require exhaustion of *procedures* available under the IDEA. Given this similarity, there is every reason to apply in the IDEA context the core holding of *Booth,* i.e., that a statutory exhaustion requirement means that a party must exhaust all available avenues of administrative review regardless of whether the administrative process offers the particular type of relief that is being sought.

*Booth* is instructive in another respect as well. The prisoner there staked out a position nearly identical to that staked out by the instant plaintiffs, arguing that exhaustion should be excused under a futility exception on the ground that the administrative process could not yield an award of money damages. The *Booth* Court's pointed rejection of that argument strongly suggests that, whatever the statutory context, a party must exhaust a mandatory administrative process even if the precise form of relief sought is not available in the administrative venue. This makes perfect sense: the administrative process, at the very least, should facilitate the development of a useful record (and, thus, assist in the informed disposition of any subsequent litigation). Seen in that light, exhaustion of the enumerated administrative procedures is useful even though the procedures cannot yield the particular redress that the claimant prefers. It follows inexorably

that, in such circumstances, exhaustion should not be excused on the ground of futility.

This result is all the more attractive when one considers the practical consequences of allowing the plaintiffs to pursue their section 1983 claim without first exhausting the IDEA's administrative process. That course of action would allow a plaintiff to bypass the administrative procedures merely by crafting her complaint to seek relief that educational authorities are powerless to grant. This would subvert not only the very existence of a mandatory exhaustion requirement but also the overall scheme that Congress envisioned for dealing with educational disabilities. We agree with the Eleventh Circuit that "[p]ermitting parents to avoid the requirements of the IDEA through such a 'back door' would not be consistent with the legislative intent of the IDEA." *N.B.*, 84 F.3d at 1379.

The plaintiffs have two other arguments peculiar to this case. First, they note that since Kate already has graduated, the administrative process can do nothing to ameliorate the bungling that marred her educational experience. We do not think that this fact can tip the balance.

■ First, even after graduation, compensatory education is an available remedy. *See Pihl v. Mass. Dep't of Educ.*, 9 F.3d 184, 188–89 & n. 8 (1st Cir.1993). Second—and more importantly—the entire matter of timing is largely within a plaintiff's control. The IDEA provides a comprehensive remedial scheme, and the plaintiffs could have invoked it at any of several different points during Kate's high school years.[3] It would be a hollow gesture to say that exhaustion is required—and then to say that plaintiffs, by holding back until the affected child graduates, can evade the requirement. As the district court aptly observed, permitting a plaintiff to proceed with an IDEA-based claim for money damages under another federal statute without first exhausting administrative remedies

> might simply encourage plaintiffs to wait to dispute the adequacy of their educational programs until after graduation precisely in the hope of recovering money damages. This would mean that plaintiffs would not actually address educational issues when they occur—a situation directly at odds with the IDEA's primary goal of ensuring the education of children with disabilities.

*Frazier*, 122 F.Supp.2d at 111.

The plaintiffs also assert that the BSEA will not hear cases which involve only monetary damages. They attempt to leverage this point into the broader proposition that it is futile for a plaintiff who seeks only money damages to bring an IDEA claim before the BSEA. This argument overstates the matter. While the BSEA has acknowledged its lack of authority to award damages in IDEA cases, it simultaneously has asserted its power to retain jurisdiction over IDEA claims that seek relief exclusively in the form of money damages. We explain briefly.

■ Although the IDEA requires impartial due process hearings, Congress left the details of those proceedings to the states. In response, Massachusetts has adopted a panoply of statutes and regulations. Under the state scheme, a parent

---

**3.** Indeed, on one occasion the plaintiffs did take formal action. In the fall of 1998, the school system offered Kate an IEP that provided for an additional year of tutoring to ensure that she was functional at a twelfth-grade level. The Fraziers rejected various parts of the IEP, and the matter was referred to the BSEA. No hearing was necessary, however, as mediation yielded a mutually acceptable compromise. Kate graduated in the spring of 1999.

may request a hearing by the BSEA regarding the evaluation of, and the appropriate educational program for, a child with a disability. *See* Mass Gen. Laws ch. 71B, § 3; Mass. Regs.Code tit. 603, § 28.08(3). Nothing in this mosaic suggests that the BSEA is barred from the adjudication of special education disputes in which a plaintiff seeks only money damages.

In furtherance of their claim that the BSEA categorically refuses to adjudicate IDEA claims in which the plaintiffs seek only monetary damages, the plaintiffs cite two BSEA proceedings. Neither precedent advances the plaintiffs' cause.

The first such case, *In Re: Natick Pub. Schs.*, 6 Mass. Spec. Educ. Rep. 48 (BSEA 99–3852) (2000), involved plaintiffs who requested the hearing officer to confirm that the BSEA lacked jurisdiction to award compensatory or punitive damages in connection with their claims. When the school system acquiesced in this position, the hearing officer ruled that the BSEA had no authority to award money damages under the IDEA, but nonetheless retained jurisdiction over the plaintiffs' claims.[4] *Id.* at 56 n. 11. This retention of jurisdiction directly contradicts the plaintiffs' ipse dixit.

The second BSEA proceeding cited by the plaintiffs, *In Re: Brockton Pub. Schs.*, 6 Mass. Spec. Educ. Rep. 17 (BSEA 00–2572) (2000), similarly fails to support their

contention. *Brockton* involved serial hearings. The initial hearings focused on amending the IEP of a potentially violent high school student. After a full airing, the hearing officer made extensive findings of fact and concluded that home tutoring represented the appropriate educational placement. The next hearing focused on the plaintiffs' claim for compensatory and punitive damages stemming from the school system's handling of the educational placement. The hearing officer ruled that the BSEA lacked jurisdiction to award money damages pursuant to the IDEA and deemed the plaintiffs' administrative remedies fully exhausted. *Id.* at 23. The crucial point here is that the hearing officer already had compiled the requisite findings of fact and, thus, a court of competent jurisdiction could rely upon the administrative record developed by the hearing officer to adjudicate the ensuing section 1983 claim.[5]

In sum, the plaintiffs have failed to carry their burden of proving that pausing to exhaust the IDEA's administrative process would be futile (and, therefore, that non-exhaustion should be excused). Accordingly, we hold that plaintiffs who bring an IDEA-based claim under 42 U.S.C. § 1983, in which they seek only money damages, must exhaust the administrative process available under the IDEA as a condition precedent to entering a state or federal court.

---

4. In *Natick*, the plaintiffs effectively distinguished their damages claim from a claim for reimbursement of expenses incurred for special education services. 6 Mass. Spec. Educ. Rep. at 50 & n.1. This strikes a responsive chord as courts typically treat reimbursement claims differently than claims for damages. *E.g., Hall v. Knott County Bd. of Educ.*, 941 F.2d 402, 407 (6th Cir.1991) (declaring that reimbursement claims should not be characterized as "damages").

5. *Brockton* helps, rather than hurts, the defendants' position in another respect as well. Fairly read, the case stands for the proposition that a BSEA administrative hearing officer has the power to enter a finding that a school system violated a student's rights. *See In Re: Brockton Pub. Schs.*, 6 Mass. Spec. Educ. Rep. at 23. Under ordinary circumstances, a trial court would have to accord considerable respect to such a finding. *See, e.g., Lenn*, 998 F.2d at 1086.

## III. THE TITLE IX CLAIM

The plaintiffs advance a series of claims under Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681–1688. These claims stem from an incident that allegedly occurred during Kate Frazier's third year at Fairhaven High School. As the plaintiffs describe the incident, Kate was relieving herself in a bathroom stall with the door closed when the school's discipline matron, defendant Janet Morency, peered into the stall through a crack between the door and the wall. The plaintiffs allege that the incident caused Kate profound distress and that, although they reported it to the school psychologist, school officials took no action against Morency. Moreover, they assert that Morency stalked Kate, "continually leering," "scowling," and "pointing" at her.

The viability of this statement of claim depends in the first instance on a question of first impression in this circuit: Is same-sex harassment actionable under Title IX? The parties have, without analysis, assumed that it is. We conclude that the assumption is well founded. Although strictly speaking, this is not determinative of our disposition of the Title IX claim, which is based on pleading inadequacy, we think it timely to pretermit later speculation by setting forth our analysis.

 Title IX prohibits gender-based discrimination in a wide array of programs and activities undertaken by educational institutions. *Cohen v. Brown Univ.*, 991 F.2d 888, 894 (1st Cir.1993). It provides in pertinent part that "[n]o person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The statute's enforcement machinery includes an implied private right of action through which an aggrieved party may seek money damages. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 283–84, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998). Since this private right of action extends only to claims against the educational institution itself, *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 901 (1st Cir.1988), the plaintiffs' Title IX claim perforce fails as to all the individual defendants. The Fairhaven School Committee is, however, potentially liable.

 There are arguably two ways in which sexual harassment in the educational milieu can constitute gender-based discrimination actionable under Title IX.[6] The first, quid pro quo harassment, is not implicated in this case. The second, hostile environment harassment, covers acts of sexual harassment sufficiently severe and pervasive to compromise or interfere with educational opportunities normally available to students. *See Brown v. Hot, Sexy & Safer Prod'ns*, 68 F.3d 525, 540 (1st Cir.1995) (explaining that such a violation occurs when the educational environment is "permeated with discriminatory intimidation, ridicule, and insult" of sufficient severity) (citation and internal quotations marks omitted).

 We have not previously considered a Title IX claim of sexual harassment involving a plaintiff and defendant of the same gender. For guidance, we turn to Title VII of the Civil Rights Act of 1964. 42 U.S.C. §§ 2000e–2000e–17. *See Wills v. Brown Univ.*, 184 F.3d 20, 25 n. 3 (1st Cir.1999) (recognizing that certain aspects of Title VII and Title IX are to be construed in pari materia); *Lipsett*, 864 F.2d

---

**6.** We say "arguably" because the Supreme Court has raised doubts as to whether these two theories should be treated separately. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 751, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). We need not probe that point today.

at 896–98 (applying the legal framework governing Title VII sexual harassment claims to similar allegations brought under Title IX); *see also Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60, 75, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (citing a Title VII hostile environment case to support a holding that a teacher's sexual harassment of a student was actionable under Title IX).

The Supreme Court has found same-sex harassment claims actionable under Title VII. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). We believe that the reasoning of *Oncale* is fully transferable to Title IX cases. The Court's observation that "[b]ecause of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against members of their group," *id.* at 78, 118 S.Ct. 998 (quoting *Castaneda v. Partida*, 430 U.S. 482, 499, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977)), has equal force in a scholastic setting. Moreover, the *Oncale* Court extended the statutory proscriptions of Title VII to same-sex harassment even though such harassment was "assuredly not the principal evil that Congress was concerned with when it enacted Title VII," *id.* at 79–80, 118 S.Ct. 998, and there is no principled basis for construing Title IX more grudgingly. We therefore hold that a hostile environment claim based upon same-sex harassment is cognizable under Title IX. *Accord Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 219–20 (5th Cir.1998); *Kinman v. Omaha Pub. Sch. Dist.*, 94 F.3d 463, 468 (8th Cir.1996).

 While our recognition that the sexual harassment of a student by a faculty member or school administrator of the same gender is actionable under Title IX means that the instant plaintiffs have won

a battle, they have not necessarily won the war. It remains to be seen whether the amended complaint brings their case within the confines of this cause of action. To succeed on that issue, the amended complaint must show (1) that Kate was a student, who was (2) subjected to harassment (3) based upon sex; (4) that the harassment was sufficiently severe and pervasive to create an abusive educational environment; and (5) that a cognizable basis for institutional liability exists. *See Brown*, 68 F.3d at 540. To satisfy the fifth part of this formulation, the plaintiffs must prove that a school official authorized to take corrective action had actual knowledge of the harassment, yet exhibited deliberate indifference to it. *Gebser*, 524 U.S. at 290, 118 S.Ct. 1989; *Wills*, 184 F.3d at 26.

 The amended complaint flunks this test. Discrimination on the basis of sex is the sine qua non of a Title IX sexual harassment case, and a failure to plead that element is fatal. *Cf. Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 258 (1st Cir.1999) (explaining that "in same-sex harassment cases as in all sexual harassment cases, the plaintiff 'must always prove that the conduct at issue was not merely tinged with offensive sexual connotations,' but in fact constituted discrimination 'because ... of sex' " (quoting *Oncale*, 523 U.S. at 81, 118 S.Ct. 998)). There is nothing in the amended complaint to suggest that Morency's behavior constituted discrimination on the basis of sex.

Nor can gender-based discrimination fairly be inferred from the circumstances limned in the amended complaint. As the high school discipline matron, Morency was "responsible for the general discipline in the halls and ways of the School." *Frazier*, 122 F.Supp.2d at 112 (citing plaintiffs' amended complaint). Acting in that capacity, she had authorized access to the restrooms used by female students in order to

ensure that nothing was amiss. Given the plethora of potential problems that persistently plague high schools in this day and age—drugs, alcohol, and the like—Morency's actions, though insensitive, do not exceed her mandate. Thus, we agree with the district court that "[t]he plaintiffs have not alleged facts from which it reasonably can be inferred that Morency's action was of a sexual nature or based on Kate's sex." *Id.*

■ The plaintiffs argue that the amended complaint, generously read, alleges a second Title IX violation: the failure of school officials to investigate the bathroom incident. But even if such a claim is properly before us—a matter on which we take no view—it nonetheless fizzles. In the absence of conduct creating a sex-based hostile educational environment, laxity on the part of school officials in investigating an incident is not actionable under Title IX. *Cf. Karibian v. Columbia Univ.*, 930 F.Supp. 134, 147 (S.D.N.Y.1996) ("If what occurs is an employer's failure to investigate and take remedial measures in response to a complaint of discrimination [based upon Title VII], and if it turns out that no actual discrimination has occurred, then there is nothing which actually constitutes any conduct banned by the statute.").

■ The plaintiffs' claim of retaliation fares no better. The amended complaint alleges that once the plaintiffs protested to the school psychologist about the bathroom incident, Morency retaliated by leering, stalking, and intimidating Kate. Once again, the jurisprudence of Title VII supplies an applicable legal framework. *See Murray v. New York Univ. Coll. of Dentistry*, 57 F.3d 243, 248 (2d Cir.1995) (endorsing adoption of Title VII standards to govern review of Title IX retaliation claims). Modifying the retaliation paradigm to fit the educational context, a plaintiff may establish a prima facie case for a Title IX retaliation claim by alleging facts sufficient to show that she engaged in activity protected by Title IX, that the alleged retaliator knew of the protected activity, that the alleged retaliator subsequently undertook some action disadvantageous to the actor, and that a retaliatory motive played a substantial part in prompting the adverse action. *See, e.g., Hazel v. U.S. Postmaster Gen.*, 7 F.3d 1, 3 (1st Cir.1993) (discussing elements of Title VII retaliation claim).

Viewed through this prism, the plaintiffs' retaliation claim cannot endure. The plaintiffs do not allege that Morency knew they had complained about the bathroom incident. Furthermore, the amended complaint excoriates Morency's conduct toward Kate both before and after the plaintiffs' protest and does not allege that Morency's conduct escalated following their remonstrance. For these reasons, the retaliation claim founders.

That ends this aspect of the matter. Because the amended complaint fails to plead facts sufficient to support the plaintiffs' Title IX claims, we affirm the district court's order of dismissal.

## IV. THE FERPA CLAIM

■ The plaintiffs also assert that the defendants violated the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, by failing to maintain the confidentiality of Kate's records. Because we conclude that FERPA does not confer a private right of action, we affirm the dismissal of this claim without discussion of its factual predicate.

■ Congress enacted FERPA "to assure parents of students ... access to their educational records and to protect such individuals' rights to privacy by limiting the transferability of their records without their consent." 120 Cong. Rec.

39,862 (1974) (joint statement of Sens. Pell and Buckley explaining major amendments to FERPA). Under its terms, educational institutions, with a few exceptions not material here, must obtain written parental consent prior to releasing students' records or information derived therefrom. The statute takes a carrot-and-stick approach: the carrot is federal funding; the stick is the termination of such funding to any educational institution "which has a policy or practice of permitting the release of educational records (or personally identifiable information contained therein ...) of students without the written consent of their parents." 20 U.S.C. § 1232g(b)(1). Assuming, for argument's sake, that the defendants disregarded this directive, the question becomes whether the plaintiffs, as private parties, are entitled to maintain a claim for money damages under FERPA. That question is a matter of first impression in this court, and the answer to it hinges on whether FERPA confers an express or implied private right of action.

The first part of the inquiry is straightforward: FERPA does not contain an express private right of action. Given the absence of a provision explicitly empowering private parties to sue, the plaintiffs may pursue their FERPA claim only if a private right of action fairly can be implied from the statutory scheme.

■■■■■ The touchstone for determining whether a federal statute implies a private right of action is congressional intent. *Sterling Suffolk Racecourse Ltd. P'ship v. Burrillville Racing Ass'n*, 989 F.2d 1266, 1268 (1st Cir.1993). In conducting this analysis, we start with a presumption against reading an implied right of action into a statute—a presumption that can be overcome only by compelling evidence of a contrary congressional intent. *Stowell v. Ives*, 976 F.2d 65, 70 n. 5 (1st Cir.1992); *see also Karahalios v. Nat'l*

*Fed'n of Fed. Employees, Loc. 1263*, 489 U.S. 527, 532–33, 109 S.Ct. 1282, 103 L.Ed.2d 539 (1989) ("Unless ... congressional intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist.") (citation omitted). To glean the intent of Congress, we rely upon the conventional tools of statutory interpretation. *Sterling Suffolk*, 989 F.2d at 1268.

■■■■■ It is apodictic that the language of a statute constitutes the preeminent indicator of legislative intent. *N.W. Airlines, Inc., v. Transport Workers Union*, 451 U.S. 77, 91, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981); *United States v. Charles George Trucking Co.*, 823 F.2d 685, 688 (1st Cir.1987). Thus, in harmony with the maxim *inclusio unius est exclusio alterius*, the explicit provision of remedies within a statute cuts sharply against the implication of a private right of action. *See Sterling Suffolk*, 989 F.2d at 1270 (suggesting that, in such a situation, an inquiring court ordinarily may conclude with confidence "that the legislature provided precisely the redress it considered appropriate").

This is such an instance. FERPA expressly authorizes the Secretary of Education—and only the Secretary—to take "appropriate actions" to enforce its provisions. 20 U.S.C. § 1232g(f). To that end, the statute directs the Secretary to create an apparatus within the Department of Education to investigate, process, review, and adjudicate putative violations. *Id.* § 1232g(g). The sole enumerated remedy for unremediated violations—the withholding of federal funds—is congruent with that grant of enforcement authority. This paradigm plainly indicates that Congress contemplated public, rather than private, enforcement. This indication becomes

compelling when one pauses to consider that, before stopping the flow of federal funding to an educational institution, FERPA requires the Secretary to find not only that the institution has failed to comply with the statutory protocol but also that compliance cannot be secured by voluntary means. *Id.* § 1232g(f).

Congress also empowered the Secretary to promulgate regulations to assist in enforcing FERPA, and the Secretary has exercised this authority. *See* 34 C.F.R. §§ 99.60–99.67. While parents and students may file written complaints through this administrative machinery, *see id.* § 99.63, the ultimate remedy remains the same: the Secretary may terminate federal funding to the offending educational institution, *id.* § 99.67. The provision of a specific remedy replete with administrative safeguards argues persuasively that Congress fashioned FERPA to include precisely the remedial action that it delineated—and none other.

If more were needed—and we doubt that it is—FERPA's legislative history is devoid of any support for the proposition that Congress intended to allow private parties to maintain causes of action for money damages. Because FERPA sprung up as an amendment on the Senate floor instead of percolating through the normal committee process, it lacks traditional legislative history materials. This gap has been partly filled by a joint statement outlining a series of critical amendments enacted shortly after FERPA became law. *See* 20 Cong. Rec. 39,862–39,866 (1974). The joint statement represents the major source of legislative history for FERPA.

Our review of this document fails to reveal a shred of evidence that Congress intended FERPA to embody a private right of action. The joint statement simply reinforces the plain language of the statute, charging the Secretary with enforcing its provisions and cautioning that failure to comply with those provisions can lead to the withdrawal of federal funding. *Id.* at 39,862.

The specific emphasis placed on the termination-of-funding remedy in both FERPA's litany of specific prohibitions, *see, e.g.,* 20 U.S.C. § 1232g(a)(1)(A) (declaring that "[n]o funds shall be made available under any applicable program to any educational agency or institution" that violates FERPA); *id.* § 1232g(a)(2) (to like effect), and in its enforcement provision, *id.* § 1232g(f), disavows the implication of any private right of action; and the legislative history bears out the suggestion that Congress did not intend FERPA to encompass a private right of action. It is, therefore, not surprising that the three other courts of appeals that have addressed the question have held that FERPA does not create an implied private right of action. *See Tarka v. Franklin,* 891 F.2d 102, 104 (5th Cir.1989); *Fay v. South Colonie Cent. Sch. Dist.,* 802 F.2d 21, 33 (2d Cir.1986); *Girardier v. Webster Coll.,* 563 F.2d 1267, 1276–77 (8th Cir.1977). We reach the same conclusion and, consequently, uphold the dismissal of the plaintiffs' FERPA claim.[7]

## V. CONCLUSION

We need go no further. We hold that the plaintiffs cannot proceed with a section 1983 claim based upon alleged IDEA violations without first having exhausted the IDEA's administrative process. We also hold that the plaintiffs have not sufficiently alleged a claim for same-sex harassment

---

**7.** While several circuits have held or implied that FERPA violations may serve as the basis for a suit under 42 U.S.C. § 1983, *see Padilla v. Sch. Dist. No. 1,* 233 F.3d 1268, 1272 n. 5 (10th Cir.2000) (collecting cases), we need not reach that issue inasmuch as the plaintiffs' amended complaint makes no such juxtaposition.

under Title IX. Finally, we hold that FER-PA gives the plaintiffs no right to pursue a claim for money damages.

*Affirmed.*