**PRONAV CHARTER II, INC., Pronav Charter VII, Inc., and Pronav Ship Management, Inc., Plaintiffs and Defendants–in–Counterclaim,**

v.

**Kenneth NOLAN, Defendant, Plaintiff–in–Counterclaim.**

No. 00–CV–11454.

United States District Court, D. Massachusetts.

Jan. 31, 2002.

Timothy R. McHugh, Looney & Grossman, Boston, MA, E. Alex Blanton, Dyer, Ellis & Joseph, Washington, DC, Kenneth Nolan, Centerville, MA, for Plaintiff.

Mark D. Stern, Law Office of Mark D. Stern, PC, Somerville, MA, for Defendant.

## MEMORANDUM AND ORDER

LASKER, District Judge.

This admiralty case relates to the allegedly improper failure of certain companies to pay Kenneth Nolan for his work as a seaman. The case commenced when Pronav Charter II, Inc., Pronav Charter VII, Inc., and Pronav Ship Management, Inc. (collectively, "Pronav") sought to reflag two vessels, the *LNG Aries* and the *LNG Taurus*. To reflag, Pronav needed an order from this Court to remove the recording of Nolan's lien against the vessels for the amount of unpaid wages he had asserted against Pronav. Nolan, acting *pro se*, countersued Pronav; two ship masters, Mark K. Lane and Warren L. Kedenburg; and the two vessels, the *Aries* and the *Taurus*, for breach of contract, breach of shipping articles, negligence, and abuse of process. The complaint has been dismissed as to Lane and Kedenburg for lack of personal jurisdiction.

Pronav and Nolan both move for summary judgment. Pronav's motion is granted and Nolan's is denied. Nolan also moves for a declaration of *in personam* and *in rem* jurisdiction over the *Aries* and the *Taurus*. The motion is denied. Finally, Pronav moves for sanctions. The motion is denied.

### I.

Pronav Charter II, Inc., Pronav Charter VII, Inc., and Pronav Ship Management, Inc., are Delaware corporations whose business is shipping. Nolan is a merchant seaman from Centerville, Massachusetts.

On two occasions relevant to this litigation, Nolan accepted a job with ships now controlled by Pronav. Nolan alleges that on neither occasion was he fully paid for the work he performed.

First, in October, 1988, Nolan accepted a job as a third assistant engineer on the *LNG Taurus*, O.N. 595754, through the Marine Engineer's Beneficial Association ("MEBA") union hiring hall in Boston, Massachusetts. He then flew to Japan to commence work. According to Nolan, although he was paid for most of his 64–day assignment, he was not paid for every day he worked.

Second, in March, 2000, Nolan accepted employment through the MEBA union hiring hall with a Pronav-controlled ship, the *LNG Aries*, O.N. 588005. When Nolan boarded the *LNG Aries* in Inchon, Korea on March 31, 2000, he reported to Lane, the master of the vessel. At that time, Lane instructed Nolan to sign a series of

documents, including a Certificate of Discharge. Nolan signed the blank Certificate, but Lane did not. Nolan and Lane then both signed shipping articles to govern Nolan's employment during the *Aries* voyage. No consular officer witnessed these transactions.

Upset by the above proceedings, Nolan decided that he had a legal right to leave the ship. Accordingly, on May 9, 2000, Nolan notified Lane of his intention to end his service. Nolan explained to Lane that it was his understanding that he had been improperly discharged when he signed the Certificate of Discharge, ending his earlier "contract" of employment with Pronav. As a ground for his decision to leave the ship, Nolan further complained that on March 31, 2000, Pronav had not complied with statutory requirements which regulate the procedures for entering into shipping articles. Four days later, on May 13, 2000, Lane and Nolan agreed that Nolan would leave the ship. Pronav purchased a business-class plane ticket for Nolan to return the United States, which cost $2,877.40. Pronav credited Nolan's unpaid wages, which were less than the cost of the plane ticket, to itself and asked Nolan to send a check for the outstanding cost. Nolan disputes that he was responsible for his repatriation costs and therefore seeks the $587.91 deducted from his wages.

## II. Cross–Motions for Summary Judgment

At the outset, Nolan has conceded certain counterclaims and continued to press others. Nolan's remaining claims are based on Pronav's alleged:

1. failure to pay one day's wages on October 11, 1988, for work Nolan performed on board the *Taurus;* and,

2. failure to sign shipping articles in the presence of a consular officer, to provide a timely accounting, and to pay wages without a deduction for travel expenditures for the *Aries* voyage.

In the first claim, based on the *Taurus* voyage, Nolan seeks the unpaid wages, the statutory penalty of two days' wages for every day not paid from May 25, 2000, to present; prejudgment interest, and costs and attorney's fees.

In the second claim, based on the *Aries* voyage, Nolan seeks the unpaid wages, the statutory penalty of two days' wages for every day not paid from May 14, 2000, to present; prejudgment interest, and costs and attorney's fees.

### A. The Taurus

Pronav moves for summary judgment on two grounds: (1) it was not the owner, operator, or manager of the *Taurus* in 1988; and (2) the claims against the *Taurus* are barred by laches.

First, Pronav argues that Nolan has not named the correct defendant, which would be the Energy Transportation Corporation ("ETC"), the owner, operator, or manager of the *Taurus* in 1988. Accordingly, any counts based on this voyage should be dismissed against Pronav.

Nolan does not address this issue.

Second, as to the laches defense, Pronav contends that Nolan was aware of the alleged pay deficiency as early as 1988, when Captain Kedenburg wrote on Nolan's Certificate of Discharge that "pay commences Oct. 12, 1988." Nolan apparently disagreed with that accounting in 1988. Pronav states that this twelve-year gap is both unexplained and prejudicial. Pronav cites relevant statutes of limitations, which are not binding but can be instructive, all of which are either two years (wage claims) or three years (willful wage claims, general maritime tort). Although Nolan alleges that he "learned of his entitlement" to wages while pursuing legal research on a

different matter in September 1999, Pronav asserts that ignorance of legal rights does not constitute a valid reason for delay. Finally, as evidence of prejudice, Pronav asserts that during this entire period penalty wages have been accruing at an astronomical rate, which is highly prejudicial.

Nolan responds by waiving his claims to penalty wages between 1988 and May 2000, thereby eliminating, from Nolan's perspective, any prejudice Pronav has suffered from the delay. Moreover, Nolan alleges that Pronav has unclean hands, and that therefore the equitable doctrine of laches should not apply. Nolan contends that the attorneys for Pronav were duplicitous in connection with commencing this suit in 2000.

Summary judgment is granted to Pronav and denied to Nolan with regard to the claims based on Nolan's voyage aboard the *Taurus* in 1988. None of the named defendants were involved in that voyage, as the *Taurus* was undisputedly controlled by ETC. Since Pronav is incorrectly named, it should be dismissed.

■ Furthermore, even if Pronav was a correct defendant, with regard to any *in rem* claim against the *Taurus*, the doctrine of laches controls. Twelve years between the time when Nolan became aware of the factual basis of his claim and when he brought the claim in court is simply too long, and ignorance of the law is no excuse. *See, e.g., Chretien v. Exxon Co., U.S.A.,* 701 F.Supp. 266, 271 (D.N.H.), *aff'd,* 863 F.2d 182, 184 (1st Cir.1988) (allowing application of doctrine of laches for unexplained two-year delay in seaman's wage case). The delay prejudiced Pronav because it now owns and operates the *Taurus,* but did not when the alleged failure to pay occurred. Accordingly, to the extent that Nolan is proceeding against the ship *in rem,* the delay harmed Pronav.

## B. The Aries

Liberally construing Nolan's muddied claims as is appropriate in circumstances involving a *pro se* litigant, it is plain that Nolan brings this suit to stand up for the procedural rights of seamen. He believes that these rights are consistently violated by Pronav, so much so that the violations are accepted practices, despite the law. Essentially, Nolan alleges that Pronav makes a practice of engaging sailors through more than one contract so as to make the rights of the seaman unclear, failing to give a timely accounting of wages earned, failing to have the signing of the contract supervised by a United States consular officer, and making sailors sign a "certificate of discharge" at the outset of a trip rather than at the end.

### 1. Contract Claims

#### a. What Contracts Existed Between the Parties?

■ The parties dispute what exactly constituted Nolan's employment agreement for the *Aries* voyage. Nolan contends that it was a "private shipping agreement" based on a February 29, 2000 letter sent by Nolan to Pronav, an Advisory issued by Pronav stating that Nolan was scheduled to join the *Aries* in Inchon, Korea on March 30, 2000, and certain understood, implied, and oral terms and conditions. However, Nolan alleges that the master of the *Aries* forced him to sign a Certificate of Discharge on March 31, 2000, immediately after he reported aboard the ship (rather than at the end of the voyage). Accordingly, Nolan contends that the above "contract" was terminated, and that he then entered into a new "shipping articles agreement."

In response, Pronav argues that no contract existed until Nolan entered into the

shipping articles agreement with Pronav aboard the *Aries,* and accordingly there could not be a breach or termination of a "private shipping agreement." Pronav asserts that signing a Certificate of Discharge at the outset of the voyage is a normal practice because the Certificate merely acts as a record-keeping device, not a formal order. According to Pronav, the Certificates are often used by seamen as proof of work experience because they show when a particular seaman served aboard a particular vessel. Moreover, only Nolan, not Lane, the ship's master, signed the document on March 31, 2000. Without the master's signature, a formal accounting, and the payment of wages, a seaman's signature on a Certificate has no legal effect, according to Pronav.

Accordingly, Pronav moves for summary judgment on the ground that the first alleged contract was not a contract at all, and that therefore Nolan has no claim to wages for the period before March 31, 2000. Pronav contends that the February 2000 letter, the Advisory, and the "implied" terms did not constitute a contract because they did not lay out the required information: compensation and the nature and duration of the voyage. Pronav argues that if Nolan's argument prevails, it would eliminate the formality of the statutory shipping article process.

The combination of the February 2000 letter, the Advisory, and certain unstated but implicit arrangements did not form a contract between Nolan and Pronav. Instead, Nolan's contract with Pronav was formed at the time he signed the shipping articles aboard the *Aries.* The initial documents do not contain all of the required elements listed in the revised and recodified Title 46, which regulates Shipping, 46 U.S.C. § 10302(b):

(1) the nature, and, as far as practicable, the duration of the intended voyage, and the port or country in which the voyage is to end.

(2) the number and description of the crew and the capacity in which each seaman is to be engaged.

(3) the time at which each seaman is to be on board to begin work.

(4) the amount of wages each seaman is to receive.

(5) regulations about conduct on board, and information on fines, short allowance of provisions, and other punishment for misconduct provided by law.

(6) a scale of the provisions that are to be provided each seaman.

(7) any stipulation in reference to advances and allotments of wages.

(8) other matters not contrary to law.

Despite Nolan's contentions, almost none of these elements are included in either the February 2000 letter or the Advisory.

For example, paragraph 15 of Nolan's First Amended Counterclaim alleges "the ADVISORY letter explicitly or impliedly contained the requirements of 46 USCA § 10302(b)(1,2,3,4)." However, the full text of that Advisory is merely:

> To Whom It May Concern:
>
> ADVISORY
>
> Please be advised the *Mr. Kenneth M. Nolan* is currently scheduled to join our vessel, SS LNG *Aries* in *Inchon,* Korea on *3-30-00.* He will be serving as 3rd Engineer on board this vessel. If you require any additional information, please feel free to contact this office.
>
> Sincerely,
>
> [signed]
>
> S.M. Nielsen

First Amended Counterclaim, Ex. C. This Advisory may meet the requirement of 46 U.S.C. § 10302(b)(3) to list "the time at which each seaman is to be on board to begin work," but it does not come close to

meeting the specifications of 46 U.S.C. § 10302(b), as to subsections (1) (the nature, and, as far as practicable, the duration of the intended voyage, and the port or country in which the voyage is to end); (2) (the number and description of the crew and the capacity in which each seaman is to be engaged); or (4) (the amount of wages each seaman is to receive).

This lack of information is not remedied by incorporating the February 29, 2000 letter sent by Nolan to Pronav. The letter is simply a job solicitation, and does not include any information about the *Aries*. First Amended Counterclaim, Ex. B at 1.

A letter dated March 23, 2000, written by Nolan and sent by facsimile to Pronav, underscores the scarcity of information in the foregoing documents. In that letter, Nolan asks Pronav whether "the job [is] for 60–days or 120–days?" First Amended Counterclaim, Ex. D at 1. If on March 23, 2000, Nolan was unclear as to the duration of the purported contract entered by himself and Pronav, then it is evident that the documents did not include the critical information required by 46 U.S.C. § 10302(b)(1) (the nature, and, as far as practicable, the duration of the intended voyage).

Furthermore, neither the February letter nor the Advisory reasonably implies the requirements laid out by 46 U.S.C. § 10302(b). This failure is especially true because 46 U.S.C. § 10302(a) requires the shipping articles to be made in writing.

But even if the documents somehow included the appropriate information, no contract was formed because the statutory provisions also require that "(e)ach shipping agreement must be signed by the master or individual in charge or a representative of the owner, charterer, or managing operator, and by each seaman employed." 46 U.S.C. § 10302(c). There is no document containing both Nolan's signature and the signature of a representative of Pronav.

In sum, these documents did not form a contract between the parties, and therefore Nolan's signature on the Certificate of Discharge on March 31, 2000, did not constitute an improper discharge within the meaning of 46 U.S.C. 10313(c) (requiring payment of earned wages and one month's pay for seamen "discharged improperly" before one month of work had been completed). On the other hand, the shipping articles signed aboard the *Aries* on March 31, 2000, did form an agreement between the parties. It was under these shipping articles that Nolan eventually demanded to leave the *Aries*, believing that Pronav had trampled his rights by the foregoing transactions.

*b. Who Should Pay for Nolan's Repatriation?*

Pronav argues that it is entitled to summary judgment on this issue because it properly entered into the shipping articles agreement with Nolan once he was aboard the ship, and Pronav insists that Nolan left under "mutual consent." Therefore, Pronav asserts that it is entitled to payment for the cost of flying Nolan back to the United States from Korea. Nolan does not dispute that the rule, apparently negotiated by the MEBA, is that when a seaman prematurely leaves his ship under "mutual consent," the seaman must pay for repatriation costs.

Nolan responds that he did not leave by "mutual consent"—instead, he contends he left under protest. Nolan therefore concludes that Pronav was responsible for the cost of the flight and that he is entitled to the wages Pronav deducted to pay for his repatriation.

This issue turns on the validity of two documents: (1) a document created by No-

lan, entitled "Signing–Off Articles Under Protest," dated May 13, 2000, which Nolan addressed to the *Aries*, and (2) a letter from the Master of the *Aries*, Mark K. Lane, to Nolan, also dated May 13, 2000. First Amended Counterclaim, Ex. H at 4; Mem. in Supp. of Pls.' Opp. to Def.'s Mot. for Summ. J., Ex. A. The first document states unequivocally that Nolan was "signing-off this vessel under protest." However, it was signed only by Nolan, and not Lane, who refused to accept the document. It was also signed as "received" by a consular officer, Robert Dolce. In contrast, the Lane letter indicates that Lane had "no objection to [Nolan] leaving at Incheon [sic] and [Lane was] willing to release [Nolan] on Mutual Consent." This letter was signed by Lane, signed as "received" by Nolan, and signed by a third person as witness to its delivery to Nolan. The issue is which of these documents controls.

The letter from Lane is the only piece of evidence of record that a factfinder could reasonably find controls the matter. The record establishes that what took place aboard the *Aries* on May 13, 2000, was the classic formation of an agreement. Nolan requested to leave the vessel and return home. Lane agreed, but only under the condition that Nolan pay for his repatriation. Formally stated, Lane would not release Nolan from service aboard the *Aries* without Nolan agreeing to leave by "mutual consent." Nolan knew that he could not leave without such a concession because of the clear language in the Lane letter, which Nolan received before departing the vessel, and because Lane also refused to sign the form that stated that Nolan was leaving under protest. Although it may be true that he was upset and sought to assert his perceived legal rights, Nolan accepted the condition to leave by "mutual consent" and reaped the benefits of the bargain. As a matter of law, Nolan left by "mutual consent."

In short, Nolan cannot enjoy the benefit of leaving the ship under the only condition the master would allow, "mutual consent," and later claim, by way of an unsigned document, that he in fact left under protest. Accordingly, Pronav's motion for summary judgment is granted and Nolan's motion is denied.

### 2. Negligence

■ There was no consular officer present at the signing of the shipping articles. Pronav contends that there need not be an American Consul present at the signing of shipping articles because, according to a letter written by the consular officer Nolan contacted, "Department of State regulations no longer require the presence of a consular officer to sign crew members or officers on or off vessels." First Amended Counterclaim, Ex. J at 1 (Letter from Robert A. Dolce, Consul, Seoul, Korea, to Nolan, dated Aug. 21, 2000).[1] But Nolan responds that 46 U.S.C. § 10308 requires the presence of a consular officer, and that the statute trumps any State Department regulations.

Pronav offers no argument defending its failure to provide a timely accounting of Nolan's wages, which Nolan states he did not receive until after he left the ship. Nolan argues that this failure violated 46 U.S.C. § 10310, which requires a "full and true account of the seaman's wages and all deductions at least 48 hours before paying off or discharging the seaman."

---

1. Pronav also contends that it cannot be liable for breach of duty as a shipping commissioner because the statute was repealed on December 20, 1993. Pub.L. No. 103–206, § 422(c)(1), 107 Stat. 2439 (1993) (repealing 46 U.S.C. § 10102). Nolan concedes this point. Accordingly, Count VI of the counterclaim is dismissed.

The claims against Pronav for all of these purported statutory violations, however, are not Nolan's to bring. As explained below, 46 U.S.C. §§ 10301–21 does not provide a private right of action. The inquiry into whether a federal statute includes such a right is twofold: is there either an express or an implied private right of action? *Frazier v. Fairhaven School Committee*, 276 F.3d 52 (1st Cir. 2002). Here, there is no express private right of action. Therefore, Nolan may proceed only if an implied private right of action exists.

In the First Circuit, "[t]he touchstone for determining whether a federal statute implies a private right of action is congressional intent," *Frazier*, 276 F.3d at 68 (citing *Sterling Suffolk Racecourse Ltd. P'ship v. Burrillville Racing Ass'n*, 989 F.2d 1266, 1268 (1st Cir.1993)), and there is a presumption against an implied private right of action. *Frazier*, 276 F.3d at 68; *Stowell v. Ives*, 976 F.2d 65, 70 n. 5 (1st Cir.1992).

The statute in dispute here provides, "[a] person violating any provision of this chapter or a regulation prescribed under this chapter is liable *to the United States Government* for a civil penalty of not more than $5,000." 46 U.S.C. § 10321(a) (emphasis added). This provision is not vestigial from statutes passed long ago. Congress reconsidered the penalty provisions of these sections in 1993, when it removed individual penalty clauses in each section and created the new section 10321, a general penalty section. At the same time, it increased the size of the possible liability "to more accurately reflect modern commercial vessel operations." 139 Cong. Rec. H10943 (daily ed. Nov. 22, 1993) (section-by-section analysis offered by Rep. Studds). Of course, if Congress had wished to provide a private right of action, it was free to do so, but it did not. It

follows that only the United States can assert such a claim. As the First Circuit has noted, "the explicit provision of remedies within a statute cuts sharply against the implication of a private right of action." *Frazier*, 276 F.3d at 68. Accordingly, all of Nolan's claims based on the failure to adhere to the statutory requirements laid out in 46 U.S.C. §§ 10301–21 are dismissed.

## III. Motion for Declaration of In Personam and In Rem Jurisdiction over the Aries and the Taurus

Nolan moves for a declaration of *in personam* and *in rem* jurisdiction over the *Aries* and the *Taurus*. He argues that the two ships consented to *in rem* jurisdiction at the preliminary injunction proceeding before this Court by making a voluntary appearance.

Pronav responds that: (1) because Nolan is not seeking arrest of the vessels, and the vessels are not within the jurisdiction of this Court, there is no need or ability to proceed *in rem;* and, (2) because it has already posted a bond for $300,000 to cover Nolan's claim, he already has an effective remedy, negating the need for *in rem* jurisdiction over the two ships.

Nolan's motion is denied. Since the above disposition of the motions for summary judgment were decided against Nolan, it is unnecessary to determine whether *in rem* jurisdiction exists over the vessels. However, it is noteworthy that Nolan has commendably waived his claims for statutory penalties for any period before May 2000, making the $300,000 bond more than adequate to redress any of his alleged injuries. Moreover, neither ship is physically within the jurisdiction of this Court.

## IV. Pronav's Motion for Sanctions

Pronav moves for Rule 11 Sanctions on the ground that Nolan told Pronav that he

was waiving certain arguments, but later continued to press them before the District Court.

Nolan has not responded to this motion.

The motion is denied. Nolan's conduct in this litigation has not been such as to warrant sanctions. Nonetheless, Nolan should be aware that Federal Rule of Civil Procedure 11 applies to *pro se* litigants. *See, e.g., Business Guides, Inc. v. Chromatic Communications Enters., Inc.,* 498 U.S. 533, 545, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991) (holding all signers of a document, not just attorneys, certify the contents of a document).

### V. Conclusion

Pronav's motion for summary judgment is granted and Nolan's motion for summary judgment is denied. Nolan's motion for a declaration of *in personam* and *in rem* jurisdiction over the *Aries* and the *Taurus* is denied. Pronav's motion for sanctions is denied. The parties shall submit proposed forms of judgment by February 8, 2002. *See* Fed.R.Civ.P. 58.

It is so ordered.