# United States Court of Appeals
## For the First Circuit

No. 02-2721

JOSHUA NIEVES-MÁRQUEZ; JESÚS NIEVES; LEONOR MÁRQUEZ,

Plaintiffs, Appellees,

v.

THE COMMONWEALTH OF PUERTO RICO; DEPARTMENT OF EDUCATION OF THE
COMMONWEALTH OF PUERTO RICO, through its Secretary, Hon. César
Rey Hernández; ELSIE TRINIDAD; EDNA ROSA-COLÓN,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Torruella, Lynch, and Howard,
Circuit Judges.

Eduardo A. Vera-Ramírez, with whom Eileen Landrón-Guardiola,
Anabelle Rodríguez, Secretary of Justice, and Ivonne Palerm-Cruz,
Deputy Secretary, were on brief, for appellants.
Alfredo Fernández-Martínez for appellees.
Kevin Russell, Attorney, Civil Rights Division, U.S.
Department of Justice, with whom Jessica Dunsay Silver, Attorney,
Civil Rights Division, U.S. Department of Justice, and R. Alexander
Acosta, Assistant Attorney General, were on brief, for the United
States as intervenor.

December 24, 2003

**LYNCH**, **Circuit Judge**.    Joshua Nieves-Márquez, a developmentally delayed and hearing-impaired teenager who attends public school in Puerto Rico, filed this federal lawsuit to compel officers of the Department of Education of the Commonwealth of Puerto Rico to provide him a sign language interpreter ordered for him several months earlier by a hearing officer under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq. The suit asserted claims under IDEA; Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 1210 et seq.; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; 42 U.S.C. § 1983; and two provisions of the Puerto Rico Civil Code.

In Puerto Rico, all public elementary schools are run by the Commonwealth's Department of Education. The Department, which receives millions of dollars in federal funding for special needs students each year, chose not to appeal from the hearing officer's order. Although the Department provided an interpreter for the rest of that school year, it stopped providing one when Joshua began the next school year, even though it conceded his continued need for one. When his parents, his special education team, and the superintendent of his school affirmed that need and requested that an interpreter be provided promptly, the Department did not respond.

When sued, the Commonwealth, the Department of Education, and the individual defendants replied that the federal court lacked

jurisdiction under the Eleventh Amendment. They also sought dismissal of the case on grounds of untimeliness, exhaustion, and lack of statutory standing, and said that the conditions for preliminary injunctive relief had not been met. Unconvinced, the trial court, after hearing evidence, granted the preliminary injunction and denied the defendants' motion to dismiss.

The defendants appeal, challenging the court's grant of a preliminary injunction and its denial of their motion to dismiss based on Eleventh Amendment immunity. Forced to reach the Eleventh Amendment question, we hold that the defendants waived any Eleventh Amendment immunity, at least as to § 504 claims, by accepting federal educational funding. Accordingly, we affirm.

## I.

The procedural history of this case and evidence presented at the preliminary injunction hearing before the district court on October 8, 2002 is described below.

On August 14, 2001, Joshua Nieves-Márquez started second grade at the María Bas de Vásquez School, a public school in Bayamón, Puerto Rico. Joshua suffers from moderate to severe bilateral hearing loss. He had just transferred to the María Bas de Vásquez School, which serves mostly hearing students, from a school for the deaf. He was twelve years old at the time and did not know how to read.

In the summer before Joshua started second grade, his parents, Jesús Nieves and Leonor Márquez, at the recommendation of a teacher, requested a certified sign language interpreter to assist Joshua in the classroom. Joshua's mother is a special education teacher. After the school failed to provide an interpreter, Joshua's parents filed an administrative complaint under 20 U.S.C. § 1415(b)(6) against the Puerto Rico Department of Education on November 6, requesting that Joshua be assigned his own sign language interpreter. On December 4, 2001, the administrative judge found that Joshua's need for a certified sign language interpreter was "urgent" and ordered the school to provide one. The Department of Education did not appeal the decision. During the second semester of the second grade, from January through May of 2002, Joshua shared a certified sign language interpreter with another student in his class. Although Joshua's mother was not fully satisfied with the sharing of an interpreter, she accepted the situation.

When Joshua entered the third grade in August 2002, however, the defendants no longer made a sign language interpreter available to him. No advance notice of this change was given to Joshua or his parents. On August 9, 2002, Joshua's parents attended a "campo" meeting with specialists, teachers, and the director of the school to analyze Joshua's special needs and the services he required. As best we can tell, this was the annual

team meeting and evaluation required under IDEA, 20 U.S.C. § 1414(d)(4)(A); the defendants have put forth no evidence otherwise. The meeting participants agreed that Joshua needed an interpreter for the third grade and that the need was urgent.

Joshua's mother notified the superintendent of María Bas de Vásquez School of the situation in August after school started and asked that a sign language interpreter be provided to her son. He told her that he did not have one available but wrote a letter on August 9 to defendant Edna Rosa-Colón, the director of the Bayamón Region of the Department of Education. The letter stated that "[w]e hope that [Joshua] can be helped to be able to solve [his need for a sign language interpreter] as soon as possible and permanently." Joshua's mother hand-delivered the letter to Rosa-Colón's secretary on August 22. Joshua and his parents received no response from the Department of Education and no explanation as to whether it was taking steps to find an interpreter for Joshua.

On October 1, 2002, the plaintiffs filed a complaint in federal district court against the Commonwealth of Puerto Rico; the Puerto Rico Department of Education, through its Secretary, Cesár Rey-Hernández; the director of the María Bas de Vásquez School, Elsie Trinidad; and the director of the Bayamón Region of the Department of Education, Rosa-Colón. The complaint sought a preliminary and permanent injunction as well as compensatory and punitive damages. On the same day that the complaint was filed,

Joshua and his parents also moved for a temporary restraining order and preliminary injunction requiring the immediate provision of a sign language interpreter. The district court held an evidentiary hearing on the motion on October 8, 2002.

At the evidentiary hearing, defense counsel admitted to the district court that "we acknowledge [Joshua] needs . . . an assistant to interpret for him beside[s] the interpretation that the school teacher can do." Joshua's third-grade teacher testified that she has only some basic knowledge of sign language and is not a certified interpreter. Joshua, she testified, is quite deaf and can only sometimes read lips and vocalize. At thirteen, he cannot read and can write only basic words, such as "mom" and "bathroom." Because the class has only nine students, the teacher tries to communicate with Joshua face-to-face, but, in her view, Joshua needs a sign language interpreter. She testified that, from what she understood, her view was shared by the school director and superintendent.

In addition, an audiologist testified that Joshua has difficulty understanding words spoken to him. Based on his evaluation of Joshua, he testified that even with a hearing aid, Joshua would not be able to hear the teacher in most classroom situations unless an FM system were available to transmit the sound of the teacher's voice directly into his hearing aid. No FM system was available in his classroom. The audiologist, who received

referrals from the Department, further testified that the majority of students with hearing loss of Joshua's type communicate much better through sign language than through verbal communication and lip reading.

Joshua's mother testified that his hearing loss has retarded his learning. For the past five years, he has worn a hearing aid, which his parents finally obtained after a series of disputes with the Department. She testified that she transferred Joshua from the school for the deaf before second grade because she was aware that services at that school would end for Joshua when he reached the age of twenty-one and she feared that he would never learn to read or be prepared for the working world if he stayed there.

On October 9, the defendants moved to dismiss the plaintiffs' IDEA, ADA, and Rehabilitation Act claims based on Eleventh Amendment immunity. Despite Ex parte Young, 209 U.S. 123 (1908), the defendants did not confine their motion to dismiss to the plaintiffs' damages claims but requested that the case against all defendants be dismissed in its entirety based on Eleventh Amendment immunity.[1] In addition, they moved to dismiss all four

---

[1] Under Ex parte Young, 209 U.S. 123 (1908), the defendant state officers were proper defendants for prospective injunctive relief, but the Commonwealth or the Department qua Department were not. Id. at 155-56, 159-60. The defendants have failed to brief those distinctions at all. Since certain defendants are proper parties, we do nothing further with the issue.

-7-

federal claims on various other grounds, arguing (1) that the plaintiffs were not "parties aggrieved" with statutory standing under IDEA's right-to-sue provision, 20 U.S.C. § 1415(i)(2), and such standing was necessary to sue under IDEA or any other federal statute, (2) that the plaintiffs had failed to exhaust administrative remedies under IDEA and thus could not sue under IDEA or any other federal statute, and (3) that the plaintiffs had brought their claims after the statute of limitations had expired. The defendants also opposed the plaintiffs' motion for a temporary restraining order and preliminary injunction on the ground that the lack of a sign language interpreter would not cause Joshua irreparable harm.

The court did not rule immediately. In the intervening three weeks, the defendants failed to produce a sign language interpreter for Joshua. On November 1, the court granted the plaintiffs' motion for a preliminary injunction and ordered the defendants to provide Joshua with a certified sign language interpreter within twenty days. It found that the plaintiffs had a substantial likelihood of success on their ADA, Rehabilitation Act, and § 1983 claims because the defendants had not disputed that Joshua was a qualified individual with a disability or that he needed a sign language interpreter to function effectively in class. It also found a potential for irreparable harm to Joshua's education. Finally, it concluded that because of the potential

harm to Joshua's education, the balance of hardships and the public interest weighed in favor of preliminary injunctive relief.

In the same opinion, the district court also ruled on the defendants' motion to dismiss.  First, it held that Eleventh Amendment immunity did not bar the ADA and Rehabilitation Act damages claims.  Second, it dismissed the plaintiffs' IDEA claim, reasoning that because Joshua and his parents had prevailed at the administrative level, they were not aggrieved by the administrative decision, and hence lacked statutory standing as "parties aggrieved" under IDEA's right-to-sue provision.  It did not, however, dismiss the ADA, Rehabilitation Act, and § 1983 claims because it found that IDEA allows plaintiffs to sue under other causes of action created by federal statutes even if they were not parties aggrieved under IDEA.  Third, the court found that, although the defendants were correct that IDEA requires plaintiffs suing under other federal statutes to exhaust IDEA administrative remedies if the suit seeks relief available under IDEA, the plaintiffs had done so by going through the administrative process in November 2001.  Finally, the court held that the plaintiffs' claims were not time-barred, regardless of whether the statute of limitations was one year (as argued by the plaintiffs) or thirty days (as argued by the defendants), because the limitations period for Joshua's claims was tolled until he reached the age of majority.

On November 27, the defendants brought this interlocutory appeal, challenging both the preliminary injunction and the denial of their motion to dismiss the plaintiffs' damages claims based on Eleventh Amendment immunity.

**II.**

A.   Appellate Jurisdiction Over Grant of Preliminary Injunction

This court has jurisdiction under 28 U.S.C. § 1292(a)(1) to hear an interlocutory appeal from the grant or denial of a preliminary injunction. Tidewater Oil Co. v. United States, 409 U.S. 151, 153 (1972).

B.   Preliminary Matters: IDEA Cause of Action, Exhaustion, and Timeliness

Injunctive relief, of course, is available only if the plaintiffs have stated a valid cause of action; otherwise, there is no probability of success.  The district court, over the plaintiffs' objection, dismissed the IDEA claim but found that plaintiffs could go forward with their ADA and Rehabilitation Act claims.  We may affirm the judgment on any ground supported by the record. Greenless v. Almond, 277 F.3d 601, 605 (1st Cir. 2002). We address first the IDEA claim for injunctive relief.

1.   "Parties Aggrieved" Under IDEA

The district court held that Joshua and his parents do not have statutory standing as "parties aggrieved" under IDEA's right-to-sue provision, 20 U.S.C. § 1415(i)(2).   We conclude otherwise.

Section 1415(i)(2) provides that "[a]ny party aggrieved by the findings and decision made [in the final stage of the due process hearings] . . . shall have the right to bring a civil action . . . in a district court of the United States." The question here is whether this language permits plaintiffs who were successful before the hearing officer to sue when the school system neither appealed from nor complied with the final administrative order and all parties agree on the continued need for services.

The district court found that Joshua and his parents were not "aggrieved" because they had prevailed at the administrative hearing. The Fourth Circuit has concluded that plaintiffs in similar circumstances lacked statutory standing under the analogous provision of IDEA's predecessor statute, the Education for All Handicapped Children Act (EHA). Robinson v. Pinderhughes, 810 F.2d 1270, 1275 (4th Cir. 1987). The Third Circuit has declined to reach the question under IDEA. Jeremy H. v. Mount Lebanon Sch. Dist., 95 F.3d 272, 278 & n.10 (3d Cir. 1996). Both courts, noting the lack of a separate enforcement provision in IDEA and the EHA, chose to imply a cause of action under 42 U.S.C. § 1983.

We conclude that Congress could not have intended to leave plaintiffs without an IDEA statutory remedy when they succeed before the hearing officer and the school system does not appeal the administrative decision but simply fails to fulfill a

-11-

continuing obligation to provide services.[2]  Statutory phrases must be read not in isolation but in light of the statute's overall structure and intent.  United States v. Morton, 467 U.S. 822, 828 (1984).  Congress could not have intended for a school system to be in a better position under IDEA when it refuses to comply with a final administrative order and its continuing obligations than when it exercises its statutory right to appeal from the order.  Where the school system exercises its right to appeal, the court is empowered by IDEA to issue injunctive relief.  See Manchester Sch. Dist. v. Crisman, 306 F.3d 1, 4 & n.3 (1st Cir. 2002) (hearing appeal by school district); Zobrest v. Catalina Foothills Sch. Dist., 509 U.S. 1, 13 (1993) (upholding preliminary injunctive relief providing a deaf child with a sign language interpreter).  It cannot be that a court is powerless under IDEA to issue injunctive relief when the school system neither appeals from nor complies with a valid administrative order and its continuing obligations.  That would open a gaping hole in IDEA's coverage.  It would create incentives for school systems to drag out the

---

[2]  At oral argument, the defendants stated that the plaintiffs would not be without a remedy because they could seek a writ of mandamus from the state court to enforce the administrative order.  This is a concession that the order had continuing effect in these circumstances.  Moreover, IDEA expressly allows plaintiffs to seek relief in a federal forum.  See 20 U.S.C. § 1415(i)(2)(A) ("[A]ction may be brought in any State court of competent jurisdiction or in a district court of the United States . . . .").  And it is far from clear from the defendants' summary presentation, without briefing, that mandamus would be available in the Puerto Rico courts.

-12-

administrative process, not to appeal administrative orders, not to announce their intentions to refuse to comply with those orders, and generally not to comply.

Such a result would undercut a number of IDEA's statutory policies.  It would render virtually meaningless the guarantee of a free appropriate public education (FAPE).  20 U.S.C. § 1415(a).  It would undercut the integrity of the administrative process, which parties are required to exhaust.  See § 1415(i)(2)(A); Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 59 (1st Cir. 2002).  It would be contrary to Congress's instruction that the administrative order be final unless appealed in a civil action.  § 1415(i)(1).  By undermining the finality of administrative orders, it would impact the "stay put" provisions of IDEA, which specify the conditions under which the educational placement of a child must be maintained, § 1415(j), and when such placement may be changed, § 1415(k)(7).  And the defendants' position would produce long delays, contrary to IDEA's policies favoring prompt resolution of disputes in order to expedite the provision of FAPE to children who may be at a formative stage of their intellectual development.  Amann v. Town of Stow, 991 F.2d 929, 932 (1st Cir. 1993).[3]

---

[3] The lack of a clause in IDEA that specifically provides for judicial enforcement of administrative orders supports rather than undercuts our analysis.  The lack of an enforcement clause shows Congress's intent to reinforce the administrative scheme and the requirement that administrative remedies be exhausted.  Our result also reinforces that scheme.

We adopt the reading of "parties aggrieved" as encompassing IDEA plaintiffs, such as Joshua and his parents, who are aggrieved by the school system's failure to appeal from and to comply with the hearing officer's continuing, valid, and final order.[4]  In reaching this result, we read the "parties aggrieved" language in light of the clear statutory commands described above.

2.  Exhaustion of Administrative Remedies

The defendants urge us to conclude that the plaintiffs' federal claims are barred because of their failure to exhaust IDEA administrative remedies.[5]  The defendants argue that although the

---

[4]    We leave open the question whether a cause of action could also be implied under 42 U.S.C. § 1983.  The Supreme Court held that IDEA's predecessor statute, the EHA, created a comprehensive remedy that barred application of § 1983.  Smith v. Robinson, 468 U.S. 992, 1009 (1984).  But Congress amended IDEA in 1986 in response to Smith, adding 20 U.S.C. § 1415(l), which provides that "[n]othing in [IDEA] shall be construed to restrict or limit the rights, procedures, and remedies available under . . . other Federal laws protecting the rights of children with disabilities."  Other circuits have read this as overturning Smith and allowing IDEA-based § 1983 claims.  See, e.g., Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 763 (3d Cir. 1995); Mrs. W. v. Tirozzi, 832 F.2d 748, 755 (2d Cir. 1987).  The First Circuit has not discussed whether the amendment overruled Smith, but it has assumed without discussion that plaintiffs may make IDEA-based claims under § 1983 as long as administrative remedies are exhausted.  Frazier v. Fairhaven Sch. Comm., 276 F.3d 52 (1st Cir. 2002).  Still, the Supreme Court has been cautious about finding implied § 1983 causes of action, Gonzaga Univ. v. Doe, 536 U.S. 273, 287 (2002), and the question was not squarely addressed in Frazier.

[5]    IDEA requires plaintiffs to exhaust IDEA administrative remedies before pursuing claims under other federal statutes for relief also available under IDEA.  IDEA provides that:
   Nothing in [IDEA] shall be construed to restrict or limit
   the rights, procedures, and remedies available under the

-14-

plaintiffs participated in the November 2001 administrative hearing and the August 2002 campo meeting, the plaintiffs have not exhausted administrative remedies.    The defendants' position is that the plaintiffs were required to return to the hearing officer and get another administrative order enforcing the original decision, even though Joshua's IEP team had determined that the order needed to remain in effect.  The district court rejected this reasoning, and we agree.

The defendants rely on two arguments to support their position.  First, the defendants argue that the administrative order was valid only for the 2001-2002 school year.  They correctly note that IDEA requires a child's IEP to be updated at least once a year.  20 U.S.C. § 1414(d)(4)(A)(i).  From this, they leap to the conclusion that Joshua must exhaust remedies by obtaining a new order every school year before he may seek review of the original order.  This argument, as to the original order, would create a situation capable of repetition, evading review.  See Board of Education v. Rowley, 458 U.S. 176, 186 n.9 (1982) (noting that

Constitution, the Americans with Disabilities Act of 1990, Title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under [subchapter II of IDEA], the administrative] procedures [of IDEA] shall be exhausted to the same extent as would be required had the action been brought under this [subchapter].
20 U.S.C. § 1415(l).

"[j]udicial review [of IDEA claims] invariably takes more than nine months to complete, not to mention the time consumed during the preceding state administrative hearings" and holding for this reason that federal courts have jurisdiction to redress IDEA claims from school years that have ended and to apply relief to future school years).

Moreover, the premise of the defendants' argument is factually incorrect. This is not a situation in which obligations expired with the new school year or in which plaintiffs sought to avoid the requirement of an annual review of an IEP. Joshua's special education team and his parents agreed at the August 2002 campo meeting that he needed an interpreter for the third grade, just as the hearing officer had determined earlier. Defendant Elsie Trinidad, the director of the school, was present at the meeting and agreed to make an urgent request for an interpreter. That request was communicated to the remaining defendants in the August 9 letter from the superintendent of the school. In essence, the team agreed that the order would continue to apply in the third grade. Even now, the defendants do not argue either that they, as the Commonwealth or officers of the Commonwealth, could challenge this local determination under Puerto Rico law or that there is any change in Joshua's condition that would affect his need for an interpreter. At oral argument and in the evidentiary hearing, they conceded that Joshua still needs a sign language interpreter.

-16-

Second, the defendants argue that, under § 1415(l), no other federal claims may be brought unless IDEA administrative remedies are exhausted and that exhaustion requires a timely filing of an IDEA suit for judicial review of the administrative action. This argument fails. The plain language of IDEA indicates that <u>judicial</u> review is not itself a component of the exhaustion of <u>administrative</u> remedies. Section 1415(l) requires that before suing under other federal statutes for relief also available under IDEA, "the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required [in an IDEA suit]." Subsections (f) and (g) provide for local and state-level administrative hearings. They do not provide for judicial review of those hearings; such review is provided separately under subsection (i). <u>Cf.</u> <u>Frazier</u>, 276 F.3d at 60-63 (referring to § 1415(l) as requiring plaintiffs to "exhaust <u>administrative</u> remedies" under IDEA (emphasis added)).

3. Statute of Limitations

The district court held that the plaintiffs' claims under the ADA and Rehabilitation Act were timely because the statute of limitations for civil actions in Puerto Rico is tolled until the plaintiff's twenty-first birthday if the cause of action accrued when the plaintiff was a minor.[6]

_____

[6] The court did not rule on the timeliness of the plaintiffs' IDEA claim because it had dismissed that claim for lack of statutory standing.

The defendants argue that the plaintiffs' claims were untimely because, under IDEA, if plaintiffs are parties aggrieved, they had to bring their court action within thirty days of the December 4, 2001 administrative order. The defendants contend that IDEA should borrow its statute of limitations from 3 L.P.R.A. § 2172, which provides the statute of limitations for the Puerto Rico Administrative Procedure Act (APA), 3 L.P.R.A. § 2175. They also contend that because the ADA and Rehabilitation Act claims are based on facts giving rise to an IDEA claim, the statute of limitations applicable under IDEA should apply to those claims as well.

The plaintiffs' federal claims -- under IDEA, the ADA, the Rehabilitation Act, and § 1983 -- all borrow the most analogous statute of limitations from Puerto Rico law, provided that it does not conflict with federal law or policy. See Wilson v. Garcia, 471 U.S. 261, 267 (1985) (§ 1983); Providence Sch. Dept. v. Ana C., 108 F.3d 1, 3 (1st Cir. 1997) (IDEA); Gaona v. Town & Country Credit, 324 F.3d 1050, 1055-56 (8th Cir. 2003) (ADA and Rehabilitation Act); Downs v. Mass. Bay Transp. Auth., 13 F. Supp.2d 130, 136 (D. Mass. 1998) (same). Even assuming arguendo that the defendants are correct that the state statute of limitations applicable to IDEA claims should apply to all four federal claims regardless of the nature of those claims, the plaintiffs' federal claims are timely.

Not all IDEA claims are necessarily governed by the same statute of limitations. In choosing statutes of limitations, this court has balanced three IDEA policy goals: the parental interest in participation, the school's interest in speedy resolution of disputes, and the child's interest in receiving educational entitlement. Id. at 931-33. Thus, this court has applied a six-year state limitations period for personal injury actions to IDEA claims for compensatory education, which seek to obtain additional education to make up for an earlier deprivation of FAPE, even though it applies a thirty-day statute of limitations to review of IDEA administrative hearings. Murphy v. Timberlane Regional Sch. Dist., 22 F.3d 1186, 1192-94 (1st Cir. 1994). And the Eleventh Circuit has held that an IDEA claim for attorneys' fees arising under 20 U.S.C. § 1415(e)(4) has a different limitations period than an IDEA claim seeking review of the agency determination under § 1415(e)(2).[7] Zipperer v. Sch. Bd. of Seminole County, 111 F.3d 847, 851-52 (11th Cir. 1997).

The defendants urge the thirty-day limitations period for judicial review of administrative orders under the Puerto Rico APA. 3 L.P.R.A. § 2172. When the "character" of IDEA claims is "essentially one of review" of an adverse administrative decision, this court has borrowed such statutes of limitations. Ana C., 108

___

[7] IDEA has since been amended, so actions seeking judicial review are brought under § 1415(i)(2), whereas those seeking attorneys' fees are brought under § 1415(i)(3).

F.3d at 3-5; Amann, 991 F.2d at 931-32 (quotation marks and citation omitted). But the plaintiffs here are not in the same position as those merely seeking judicial review of adverse administrative orders. The plaintiffs, in turn, rely on Puerto Rico's one-year statute of limitations for personal injury actions, 31 L.P.R.A. § 5298. But the year-long length of this limitations period raises its own concerns. When a disabled child is denied IDEA benefits, prompt resolution of the situation should be encouraged.[8]

We need not resolve these issues. Even under a thirty-day statute of limitations, the plaintiffs' federal claims are timely. The defendants argue that the limitations period accrued when the administrative order issued on December 4, 2001. This rule has the absurd result of requiring the plaintiffs to bring suit by January 4, 2002, before they had suffered the injury that is the basis for their claims.

Instead, we hold that the plaintiffs' claims did not even arguably begin to accrue until early September 2002 -- within thirty days of the October 1, 2002 complaint. The time at which

---

[8] The same concern about prompt resolution of IDEA claims is raised by the district court's ruling that the statute of limitations is tolled until children reach the age of majority. The defendants present a legitimate concern that, under such a rule, they could be held hostage for some potential damages claims based on IDEA, the Rehabilitation Act, or the ADA for as long as eighteen years. See 20 U.S.C. § 1412(a)(1)(A) (IDEA coverage begins at age three).

this claim began to accrue is an issue of federal, not local, law. Under federal law, "the time of accrual of a civil rights action is when the aggrieved party knows or has reason to know of the injury which is the basis for his action or when facts supportive of a civil rights action are or should be apparent to a reasonably prudent person similarly situated." Rodriguez-Narvaez v. Nazario, 895 F.2d 38, 41 n.5 (1st Cir. 1990). While Joshua and his parents were waiting for a response from the Department, they did not know or have reason to know whether Joshua would be given a sign language interpreter for the school year. The superintendent's letter indicated that the problem might be solved "soon" and "permanently" if the Department intervened. It was reasonable to have waited at least until September 2, 2002 -- eleven days after the delivery of the letter -- to conclude that the Department would not comply. The plaintiffs' claims are not time-barred.

C. Standards for Preliminary Injunctive Relief

Although a preliminary injunction is sometimes said to be reviewed for abuse of discretion, the standard of review depends on the issue under consideration. See Langlois v. Abington Hous. Auth., 207 F.3d 43, 47 (1st Cir. 2000). "[P]ure issues of law (e.g., the construction of a statute) are reviewed de novo, findings of fact for clear error, and 'judgment calls' with considerable deference depending upon the issue." Id.

-21-

To obtain a preliminary injunction, the plaintiffs bear the burden of demonstrating (1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest. McGuire v. Reilly, 260 F.3d 36, 42 (1st Cir. 2001). The defendants contend that the district court erred in granting the preliminary injunction because the plaintiffs failed to show a substantial likelihood of success on any of their federal claims and failed to demonstrate potential irreparable harm.

1. Substantial Likelihood of Success

There is sufficient evidence to support the district court's conclusion that a sign language interpreter was necessary to provide Joshua the free appropriate public education guaranteed to him under IDEA and the accommodations required for him under § 504. The hearing officer determined in December 2001 that IDEA requires that Joshua be provided with a sign language interpreter and that his need was "urgent." This determination is final because the defendants did not seek judicial review. 20 U.S.C. § 1415(i)(1)(A). A mere eight months later, the defendants again deprived Joshua of such an interpreter. Even assuming arguendo that the defendants could present an argument of changed conditions without having first exhausted administrative remedies, no evidence has been presented in support of such an argument. To the

contrary, the defendants have conceded that Joshua is still in need of an interpreter.

As to the Rehabilitation Act, the defendants argue, based on interpretive regulations, that the plaintiffs have failed to state a claim at all. They cite regulations stating that "[a]ttendants, individually prescribed devices, readers for personal use or study, or other devices or services of a personal nature are not required under this section," 28 C.F.R. § 42.503(f), and argue that this means sign language interpreters are not covered.[9] The defendants left out two crucial sentences, perhaps inadvertently, in quoting this regulation:

> A [federal funding] recipient that employs fifteen or more persons shall provide appropriate auxiliary aids to qualified handicapped persons with impaired sensory, manual, or speaking skills where a refusal to make such provision would discriminatorily impair or exclude the participation of such persons in a program or activity receiving Federal financial assistance. Such auxiliary aids may include brailled and taped material, qualified interpreters, readers, and telephonic devices.

Id. (emphasis added). The regulation's reference to "qualified interpreters" means that the earlier language of § 42.503(f) does not undercut the plaintiffs' showing of a substantial likelihood of

_____

[9] Although the defendants contend that 28 C.F.R. § 42.503(f) applies to both the ADA and the Rehabilitation Act, the regulation in fact applies only to the Rehabilitation Act. Section 42.503(f) refers only to discrimination in federally funded programs and is listed in a subpart entitled "Nondiscrimination Based on Handicap in Federally Assisted Programs or Activities-- Implementation of Section 504 of the Rehabilitation Act of 1973."

-23-

success. The defendants do not point to any differences between the coverage of IDEA and § 504 that would be material here.

There was no abuse of discretion in finding a substantial likelihood of success on the merits under IDEA and the Rehabilitation Act.[10]

2. Irreparable Harm

The district court did not abuse its discretion in determining that, without a sign language interpreter and with no immediate prospects of one, Joshua would suffer irreparable harm. At the evidentiary hearing and oral argument, the defendants argued that they intended to comply with the administrative order but had difficulty obtaining a certified sign language interpreter. They suggested that the denial of preliminary injunctive relief would not cause irreparable harm because Joshua would be provided with an interpreter as soon as one became readily available. The defendants' argument is at odds with other positions that they have taken in this litigation and with the Department of Education's silence when Joshua's parents and the María Bas de Vásquez School raised the urgent need for an interpreter in August 2002.

---

[10] As to the ADA, there is an analogous regulation stating that "[t]his part does not require a public entity to provide to individuals with disabilities . . . individually prescribed devices, such as prescription eyeglasses or hearing aids . . . or services of a personal nature including assistance in eating, toileting, or dressing." 28 C.F.R. § 35.135. This rule does not appear to exclude the provision of sign language interpreters from the coverage of the ADA. But we need not resolve this issue, as the other two grounds suffice.

-24-

Defense counsel conceded in the evidentiary hearing that the interpreter position had not even been advertised. Over two months passed between the Department's receiving notice of the problem from Joshua's parents and the district court's decision in the case, and at no point did the defendants notify Joshua and his parents or the district court that they had solved the problem by finding an interpreter. When ordered to provide a certified interpreter by the district court in November 2002, the defendants procured one within ten days. These facts adequately support the conclusion that, without preliminary injunctive relief, Joshua would likely not be provided with an interpreter in the immediate future.

The evidence also supports the conclusion that, without a sign language interpreter and with no immediate prospects of one, Joshua would suffer irreparable harm. See Blackman v. Dist. of Columbia, 185 F.R.D. 4, 7 (D.D.C. 1999) (finding irreparable harm in that case because "at the rate at which a child develops and changes, especially one at the onset of biological adolescence . . . , a few months can make a world of difference" in harm to a child's educational development). Not all cases of delay or non-compliance with a hearing officer's final IDEA order will necessarily result in irreparable harm. Here, though, Joshua was destined to spend a silent, fruitless year in school with only the

most remote hopes of being educated.  By the time the injunction issued, one third of that school year had already elapsed.

3.  Balance of Hardships and the Public Interest

The district court did not abuse its discretion in finding that the factors regarding the balance of hardships and the public interest favor the plaintiffs.  The defendants do not even argue these points on appeal.

We affirm the grant of preliminary injunctive relief.

**III.**

A.  Scope of Appellate Jurisdiction Over Denial of Motion To Dismiss on Eleventh Amendment Grounds

The defendants moved to dismiss the plaintiffs' damages claims, arguing that, under the Eleventh Amendment, they are immune from any and all claims for monetary relief.  Importantly, for purposes of appellate jurisdiction, the defendants did not argue that some damages claims may be asserted against them but not other ones.[11]  The district court denied the defendants' motion.  This court has jurisdiction to hear an interlocutory appeal from that

---

[11]     Our exercise of appellate jurisdiction over the Eleventh Amendment issue is perfectly consistent with Espinal-Dominguez v. Commonwealth of Puerto Rico, No. 03-1551 (1st Cir. 2003).  In Espinal-Dominguez, this court found that it lacked appellate jurisdiction over an interlocutory appeal from the denial of Eleventh Amendment immunity where the defendant asserted immunity from some, but not all, forms of monetary relief.  Id. slip op. at 17.  Here, the defendants have asserted immunity against all forms of monetary relief, which is the classic situation under P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139 (2003).

-26-

denial.  <u>P.R. Aqueduct & Sewer Auth.</u> v. <u>Metcalf & Eddy, Inc.</u>, 506 U.S. 139, 147 (1993).  Our review of this issue is plenary.

Two questions arise as to the scope of appellate jurisdiction in this case.  The first issue is whether the defendants' summary notice of appeal covers the denial of the motion to dismiss.[12]  Fed. R. App. P. 3(c) requires that a notice of appeal "designate the judgment, order, or part thereof being appealed from."  The defendants' notice of appeal refers only to "Preliminary Injunction Order . . . issued and entered on November 1, 2002."  This notice could be read as appealing only the part of the November 1 order granting a preliminary injunction.  Alternatively, it could be stretched to encompass the entire November 1 order, including the court's denial of the motion to dismiss.  Because the plaintiffs did not object to the ambiguity of the notice and both sides briefed the Eleventh Amendment issue, we read the notice of appeal liberally to cover both parts of the November 1 order.  <u>See</u> <u>Blockel</u> v. <u>J.C. Penney Co.</u>, 337 F.3d 17, 23-24 (1st Cir. 2003).

---

[12]     This discussion assumes arguendo that we would be neither required nor authorized to review the Eleventh Amendment issue if the defendant had failed to provide an adequate notice of appeal. Ordinarily, a court must consider questions of subject matter jurisdiction even if not covered by the notice of appeal.  <u>See</u> <u>Seale</u> v. <u>INS</u>, 323 F.3d 150, 152 n.1 (1st Cir. 2003).  Unlike with issues of subject matter jurisdiction, however, courts are not <u>required</u> to decide Eleventh Amendment issues not properly before them.  <u>Patsy</u> v. <u>Bd. of Regents</u>, 457 U.S. 496, 515 (1982).  In any event, the notice of appeal, as described above, is adequate, albeit barely so.

The second issue is whether this court has appellate jurisdiction to address the defendants' claim that the complaint fails to state any claim for damages under any theory because the statutes involved provide for no more than equitable remedies. The defendants urge that these arguments be reached before reaching their Eleventh Amendment argument. The issue is one of first impression for us. Although the "collateral order" doctrine allows this court to hear interlocutory appeals from denials of motions to dismiss based on Eleventh Amendment immunity,[13] see Metcalf & Eddy, Inc., 506 U.S. at 147, the United States, as intervenor, argues that, in adjudicating those appeals, we may not address whether the plaintiffs have stated, under any theory, a damages claim against which Eleventh Amendment immunity can be asserted. Mindful that the Supreme Court has not yet decided this question, we disagree.

In Swint v. Chambers County Commission, 514 U.S. 35 (1995), the Supreme Court made clear that although the court of appeals had collateral order jurisdiction over an interlocutory appeal from a denial of qualified immunity to individual police officers, it did not have pendent jurisdiction over the appeal of

---

[13] The collateral order doctrine allows courts to hear appeals from judgments that are not complete and final if they "fall in that small class which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." Cohen v. Beneficial Ind. Loan Corp., 337 U.S. 541, 546 (1949).

-28-

another party, a county commission, on a claim that the sheriff was not its policymaker. Id. at 41-43. The Court held that the court of appeals does not have discretion to exercise pendent jurisdiction when the otherwise unappealable issue is not "inextricably intertwined" with the issue on collateral order appeal.[14] Id. at 48-51. The Court left open the question of the scope of appellate jurisdiction when the issues are inextricably intertwined. Id. at 51.

Here, the question whether a cause of action for damages exists is inextricably intertwined with the issue of Eleventh Amendment immunity. Under Ex parte Young, state officers do not have Eleventh Amendment immunity from claims for prospective injunctive relief. 209 U.S. at 155-56, 159-60. The Eleventh Amendment issue arises only as to monetary relief. Sound doctrine supports the exercise of jurisdiction over the availability of monetary relief as part of our interlocutory jurisdiction over pure claims of Eleventh Amendment immunity. First, assertion of such jurisdiction is in keeping with the rule that courts should avoid deciding constitutional issues if non-constitutional grounds are available. See Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 347

---

[14]   This court had prefigured this issue in Roque-Rodriquez v. Lema Moya, 926 F.2d 103, 105 & n.2 (1st Cir. 1991) ("[T]his circuit has refrained from attempting to exercise pendent appellate jurisdiction over matters beyond those bound up in the qualified immunity inquiry." (internal quotation marks and citation omitted)).

-29-

(1936) (Brandeis, J., concurring); Greenless, 277 F.3d at 607-08 (applying this rule in the Eleventh Amendment context). Second, like the Supreme Court's rejection of the doctrine of hypothetical jurisdiction, Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998), it avoids the issuance of advisory opinions. See id. at 101. Third, it is in keeping with the rationale of Parella v. Retirement Board of the Rhode Island Employees' Retirement System, 173 F.3d 46 (1st Cir. 1999), which this court has repeatedly endorsed. See, e.g., Restoration Pres. Masonry, Inc. v. Grove Eur. Ltd., 325 F.3d 54, 59-60 (1st Cir. 2003); Seale v. INS, 323 F.3d 150, 155 (1st Cir. 2003); Greenless, 277 F.3d at 607. Parella recognized that courts should avoid unnecessarily reaching Eleventh Amendment issues because, inter alia, doing so can squander scarce judicial resources and force defendants to expend resources litigating Eleventh Amendment questions when not necessary to resolve the case. 173 F.3d at 56. Those same concerns apply here. It is important that it is the party claiming Eleventh Amendment immunity that asks us to decide first whether any claim for damages is asserted at all.

The United States relies on Bell Atlantic-Pennsylvania, Inc. v. Pennsylvania Public Utility Commission, 273 F.3d 337 (3d Cir. 2001). That opinion does not support the government's broad argument. The Third Circuit in Bell Atlantic was concerned with whether, when hearing an interlocutory appeal from the denial of a

-30-

motion to dismiss based on qualified immunity, it also had jurisdiction under the collateral order doctrine to hear the very different issues of res judicata and the statute of limitations. Id. at 344. Like the Third Circuit, we agree that not every issue raised by the denial of a pre-trial motion to dismiss may be reached on collateral order appeal; indeed, most may not be. But our jurisdiction extends to the issue whether damages are available at all because that issue is inextricably intertwined with the issue of Eleventh Amendment immunity, which arises only if such damages are available.[15]

B.   Availability of Damages

Not all of the plaintiffs' claims create a cause of action for damages.

1.   Section 1983

No cause of action for damages is stated under 42 U.S.C. § 1983 against a state, its agency, or its officials acting in an official capacity. Will v. Mich. Dept. of State Police, 491 U.S. 58, 71 (1989).

---

[15]   We do not decide whether the individual defendants had sufficient involvement to be liable to the plaintiffs for damages, cf. Koslaw v. Commonwealth of Pennsylvania, 302 F.3d 161 (3d Cir. 2002), as that issue is not inextricably intertwined with the Eleventh Amendment question and lies beyond our appellate jurisdiction.

2.    IDEA

We conclude that tort-like money damages, as opposed to compensatory equitable relief, are not available under IDEA. Awards of compensatory education and equitable remedies that involve the payment of money, such as reimbursements to parents for expenses incurred on private educational services to which their child was later found to have been entitled, remain available, but the plaintiffs here have not pled claims for such remedies.

This circuit has foreshadowed our holding that money damages are not available under IDEA.  It has noted in dicta without discussion "the fact that the array of remedies available under the IDEA does not include money damages." Frazier, 276 F.3d at 59.  And it has held that damages were not available under the identical remedial language of the Education for All Handicapped Children Act (EHA), IDEA's predecessor statute. Doe v. Anrig, 692 F.2d 800, 812 (1st Cir. 1982).

Our conclusion follows the lead of the Supreme Court and our sister circuits.  Under the identical remedial language of the EHA, the Supreme Court held that the district court could order reimbursement of private educational expenses because -- and the Court was emphatic on this point -- such reimbursement did not constitute damages. Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 370-71 (1985).  Following Burlington, most courts have found that tort-like money damages are not available under

IDEA even though the statutory language does not expressly preclude such damages.[16]  We agree with the reasoning of these courts that IDEA's primary purpose is to ensure FAPE, not to serve as a tort-like mechanism for compensating personal injury.  See, e.g., Polera v. Bd. of Educ., 288 F.3d 478, 486 (2d Cir. 2002).

3.    Section 504 of the Rehabilitation Act and Title II of the ADA

The law remains somewhat undeveloped as to the availability of damages on these pleadings under Title II and § 504.  Part of the difficulty arises from the overlapping nature of liability under these statutes and under IDEA.  All three statutes may be available to redress particular denials of a free appropriate public education, depending on the context.  IDEA and § 504 apply similar standards for substantive relief,[17] and although

---

[16] See Polera v. Bd. of Educ., 288 F.3d 478, 483-86 (2d Cir. 2002) (damages not available under IDEA); Witte v. Clark County Sch. Dist., 197 F.3d 1271, 1275 (9th Cir. 1999) (same); Sellers by Sellers v. School Bd., 141 F.3d 524, 526-27 (4th Cir. 1998) (same); Charlie F. by Neil F. v. Board of Educ., 98 F.3d 989, 991 (7th Cir. 1996) (same); Heidemann v. Rother, 84 F.3d 1021, 1033 (8th Cir. 1996) (same); Crocker v. Tenn. Secondary Sch. Athletic Ass'n, 980 F.2d 382, 386-87 (6th Cir. 1992) (damages not available under EHA); Manecke v. School Bd., 762 F.2d 912, 915 n.2 (11th Cir. 1985) (same).

[17]    The denial of FAPE obviously gives rise to a substantive claim under IDEA.  20 U.S.C. § 1412.  The regulations implementing § 504 parallel IDEA's language regarding substantive claims, requiring public schools receiving federal funding to "provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction."  34 C.F.R. § 104.33(a).  But it may be that children can qualify as disabled for purposes of § 504 but not IDEA.  See Muller v. Comm. on Special Education, 145 F.3d 95, 100 n.2 (2d Cir. 1998); but see N.L. v.

-33-

Title II employs different wording,[18] none of those differences appears to be material on these facts. Given the similarities in the substantive standard for relief, the question arises whether the availability of damages should differ under these three statutes.

Although damages are sometimes available under § 504 and Title II in certain circumstances, if federal policy precludes money damages for IDEA claims, it would be odd for damages to be available under another vehicle, such as § 504 or Title II, where the underlying claim is one of violation of IDEA. Several circuits have barred money damages under 42 U.S.C. § 1983 for IDEA-based claims for precisely this reason.[19] This circuit held twenty years ago that damages for the denial of FAPE should not be available

---

Knox County Schs., 315 F.3d 688, 696 & n.5 (6th Cir. 2003) (disagreeing and collecting cases to the contrary). And it may be that § 504 claims require some showing of deliberate indifference not required by IDEA. See Sellers, 141 F.3d at 528-29.

[18] Title II of the ADA is violated if (1) the child is a qualified individual with a disability, (2) he or she was denied the benefits of public educational services, programs, or activities, excluded from participating in such services, programs, or activities, or otherwise discriminated against, and (3) that denial was by reason of his or her disability. See Race v. Toledo-Davila, 291 F.3d 857, 858 (1st Cir. 2002).

[19] See Sellers, 141 F.3d at 529-31; Heidemann, 84 F.3d at 1033; Crocker, 980 F.2d at 386-87 (EHA). The Third Circuit, however, has disagreed. See W.B. v. Matula, 67 F.3d 484, 494-95 (3d Cir. 1995) (approving damages under both § 504 and § 1983 for IDEA-based claims). And this circuit has assumed without discussion that damages were available under § 1983 for a violation by a town school system of IDEA rights. Frazier, 276 F.3d at 59-60.

under § 504 because they were not available under the EHA, IDEA's predecessor statute.  Colin K. by John K. v. Schmidt, 715 F.2d 1, 9-10 (1st Cir. 1983).  But the Commonwealth has not briefed this issue to us, and we are reluctant to resolve it.

Even assuming arguendo that damages are available under § 504 and Title II in cases such as this, despite being precluded under IDEA, the question also arises whether damages are available on the facts alleged in these pleadings.  The complaint seeks compensatory and punitive damages for economic and emotional harm and pain and suffering caused by the denial of FAPE.

Punitive damages are clearly not available on either the § 504 or the Title II claim.  Barnes v. Gorman, 536 U.S. 181, 189 (2002).

To state a claim for compensatory damages, the plaintiffs must clear two hurdles.  First, private individuals may recover compensatory damages under § 504 and Title II only for intentional discrimination.  See Alexander v. Sandoval, 532 U.S. 275, 280-81 (2001).[20]  Here, the plaintiffs clear this hurdle because the complaint, with all reasonable inferences drawn in its favor,

---

[20]  Alexander v. Sandoval, 532 U.S. 275 (2001), holds that compensatory damages are available under Title VI only for intentional discrimination.  Id. at 280-81 (citing Guardians Ass'n v. Civil Serv. Comm'n, 463 U.S. 582 (1983)).  Section 504 of the Rehabilitation Act and Title II of the ADA borrow their remedies from Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.  See 42 U.S.C. § 12133 (Title II of the ADA borrows remedies from the Rehabilitation Act); 29 U.S.C. § 794a(a)(2) (Rehabilitation Act borrows remedies from Title VI).

alleges intentional discrimination.[21]   The defendants deny that there was any wrongful intent, but at this stage, we must credit the pleadings.

Second, the plaintiffs must show that the type of damages alleged are available as compensatory damages under § 504 and Title II.   The Supreme Court has held that compensatory damages are generally available under both statutes.  Id. at 279-80; see also Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60, 66 (1992) ("[W]e presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise.").   The Court has not defined the content of "compensatory damages" in this context. Other courts are divided over whether compensatory damages under § 504 and Title II include damages for emotional harm or pain and suffering caused by the denial of FAPE.[22]   This court held that such

---

[21]   The complaint alleges that the defendants claimed "they [were] exempt from complying with federal law that makes discrimination based [on] disability unlawful."   It also alleges that the defendants' "conduct [was] irrational, arbitrary and unreasonable  and is but a pretext" for discrimination, and that the "defendant[s] ha[ve] engaged for years in a pattern and practice of discriminating against some children with disabilities."

[22]   Compare United States v. Forest Dale, Inc., 818 F. Supp. 954, 970 (N.D. Tex. 1993); Rivera Flores v. P.R. Tel. Co., 776 F. Supp. 61, 71 (D.P.R. 1991); Jenkins v. Skinner, 771 F. Supp. 133, 136 (E.D. Va. 1991); Americans Disabled for Accessible Pub. Transp. v. Skywest Airlines, 762 F. Supp. 320, 325 (D. Utah 1991); with W.B., 67 F.3d at 495 (declining to preclude compensatory damages from generalized pain and suffering caused by the denial of FAPE, but noting that educational services are often more valuable than any money damages that could be awarded); Kuntz v. City of New Haven, 9 A.D.D. 1318 (D. Conn. 1993); Zaffino v. Surles, 9 A.D.D.

damages were not available when there was no evidence of economic harm or animus toward the disabled, but left open the question of whether such damages could be available in other circumstances. Schultz v. Young Men's Christian Ass'n of U.S., 139 F.3d 286, 290-91 (1st Cir. 1999). It is unclear at this stage whether there has been economic harm; plaintiffs have pled that such harm exists, and since we must credit that pleading, that suffices for present purposes.

At this point, we cannot say with certainty that a damages award under § 504 or Title II is precluded on these pleadings, at least for intentional conduct causing economic harm. Thus, we address the Eleventh Amendment issue.

C.   Eleventh Amendment Immunity

1.   Title II of the ADA

Puerto Rico is treated as a state for purposes of Eleventh Amendment immunity. P.R. Ports Auth. v. M/V Manhattan

---

511 (S.D.N.Y. 1995); Sumes v. Andres, 938 F. Supp. 9, 13 (D.D.C. 1996); Doe v. District of Columbia, 796 F. Supp. 559, 571-73 (D.D.C. 1992); cf. Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 650 (1999) (allowing private damages action under Title IX, which employs a similar remedial scheme, to redress the denial of "access to the educational opportunities or benefits" because of intentional sex discrimination, but not characterizing such damages as compensation for mental distress).

   The Supreme Court's recent decision in Barnes v. Gorman, 536 U.S. 181 (2001), creates even more uncertainty regarding this issue by suggesting that remedies under Title VI could be limited to those available under contract law. Id. at 187-88 & n.2; see also The Supreme Court, 2001 Term -- Leading Cases, 116 Harv. L. Rev. 312, 317-18 (2002).

-37-

Prince, 897 F.2d 1, 9 (1st Cir. 1990).  The issue whether the Eleventh Amendment precludes damages actions against states, state agencies, and state officers in their official capacities under Title II of the ADA is pending before the Supreme Court in Lane v. Tennessee, 315 F.3d 680 (6th Cir.), cert. granted, 123 S. Ct. 2622 (2003) (mem.).  Accordingly, we direct the district court to stay all proceedings as to such ADA damages claims (but not as to § 504 damages claims) until Lane is decided.

2.  Section 504 of the Rehabilitation Act

The Commonwealth argues that it has not waived immunity under the Rehabilitation Act.  Title VI, from which § 504 of the Rehabilitation Act borrows its remedies, provides that "[a] State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973."  42 U.S.C. § 2000d-7.  The United States has intervened to argue, inter alia, that under § 2000d-7, the Commonwealth has waived any Eleventh Amendment immunity that it may have had by applying for and accepting federal funds for the programs involved.  We agree.

The defendants respond first that Congress cannot seek a waiver of Eleventh Amendment immunity under § 504 unless Congress has first established that it has the power to abrogate a state's constitutional immunity.  They thus argue that we must reach the question of Congress's power to abrogate.  The defendants' position

-38-

is illogical and would render the entire waiver doctrine irrelevant. The two questions -- whether Congress has the power to subject Puerto Rico to suit under § 504 by abrogating its immunity and whether Puerto Rico waived any immunity it may have had under § 504 by accepting federal funds -- are separate. We need not address Congress's power to abrogate because we find that Puerto Rico waived any immunity it had.

Puerto Rico appears to argue that Congress may never require a waiver of Eleventh Amendment immunity as a condition of federal funding.[23] The Supreme Court has flatly rejected this argument. The Court has repeatedly held that Congress may condition the receipt of federal funds on a state's relinquishment of certain immunities. E.g., Coll. Sav. Bank v. Fla. Prepaid Post-Secondary Educ. Expense Bd., 527 U.S. 666, 686 (1999) (noting the circumstances under which Congress may condition the exercise of an Article I power on a state's agreement to relinquish Eleventh Amendment immunity); Alden v. Maine, 527 U.S. 706, 755 (1999) ("[T]he Federal Government [does not] lack the authority or means to seek the States' voluntary consent to private suits."); Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 247 (1985) (indicating that Congress may "condition participation in . . .

---

[23] Congress purported to enact § 504 pursuant to § 5 of the Fourteenth Amendment. See Welch v. Texas Dep't of Highways & Public Transp., 483 U.S. 468, 472 n.2 (1987). In enacting § 2000d-7, however, Congress also acts under the Spending Clause.

programs funded [by statute] on a State's consent to waive its constitutional immunity," provided that Congress speaks with a clear voice).

Puerto Rico also appears to argue that Congress's power under the Spending Clause does not encompass the ability to require a waiver under § 504. We disagree, as has every other circuit to have considered this argument. See A.W. v. Jersey City Pub. Schs., 341 F.3d 234, 242-44 (3d Cir. 2003); Lovell v. Chandler, 303 F.3d 1039, 1051 (9th Cir. 2002); Jim C. v. United States, 235 F.3d 1079, 1080-81 (8th Cir. 2000) (en banc).

For the reasons well-articulated by the Third Circuit in A.W., 341 F.3d at 241-44, there is no serious challenge to § 2000d-7 under the Spending Clause. Under South Dakota v. Dole, 483 U.S. 203 (1987), Spending Clause legislation must satisfy five requirements: (1) it must be in pursuit of the "general welfare," (2) conditions of funding must be imposed unambiguously, so states are cognizant of the consequences of their participation, (3) conditions must not be "unrelated to the federal interest in particular national projects or programs" funded under the challenged legislation, (4) the legislation must not be barred by other constitutional provisions, and (5) the financial pressure created by the conditional grant of federal funds must not rise to the level of compulsion. Id. at 207-08, 211. The first and fourth requirements are clearly satisfied here, and the second requirement

is as well, for the reasons articulated below.  As to the third requirement, § 2000d-7 is manifestly related to Congress's interest in deterring federally supported agencies from engaging in disability discrimination.  A.W., 341 F.3d at 243-44.  As to the fifth requirement, Congress's requirement that states waive immunity as to § 504 in exchange for federal funding is not coercive.  The waiver is as to the particular program or agency that receives federal funds.  See 29 U.S.C. § 794(a).  Puerto Rico has the choice of accepting federal funding elsewhere in its government while declining federal funding for its Department of Education.

Puerto Rico has clearly waived its Eleventh Amendment immunity under § 504.  Section 504 applies only to recipients of federal funding.[24]  The Department of Education does not dispute that it received federal funds at all relevant times.[25]  Because

---

[24] Section 504's remedies provision, 29 U.S.C. § 794a(a)(2), provides that "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 504 of this title" (emphasis added).

[25] Puerto Rico and its local governments received $4.8 billion in federal grants in 2002.  U.S. Census Bureau, Federal Aid to States for Fiscal Year 2002, at 1 tbl. 1 (2003).  Of that, $650 million was from the U.S. Department of Education for programs such as special education, bilingual education, educational research, special education and rehabilitative services, vocational and adult education, primary and secondary education, postsecondary education, and student financial assistance.  Id. at 5 tbl. 1, A-4 to A-7.  Of that, $77.8 million was for special education.  Id. at 5 tbl. 1 (2003).

we find that Congress has clearly expressed its intent to require waiver, the Commonwealth has waived its immunity by accepting federal funds.  See Arecibo Cmty. Health Care, Inc. v. Puerto Rico, 270 F.3d 17, 24-25 (1st Cir. 2001).

Congress's intent to require waiver is clear, as the history of § 2000d-7's enactment demonstrates.  In 1985, the Supreme Court in Atascadero State Hospital v. Scanlon, 473 U.S. 234 (1985), held that § 504 did not contain a clear congressional intent to require waiver.  Id. at 247.  In response, Congress enacted § 2000d-7.  As the Court noted in Lane v. Pena, 518 U.S. 187 (1996), § 2000d-7 is an unequivocal expression of Congress's intention to require waiver of states' Eleventh Amendment immunity as a condition of federal financial assistance under the Rehabilitation Act.  Id. at 198.

The majority of circuits that have addressed the issue have also held that § 2000d-7 unambiguously requires states to waive their Eleventh Amendment immunity. See A.W., 341 F.3d 242-44 (3d Cir. 2003); Nihiser v. Ohio EPA, 269 F.3d 626, 628 (6th Cir. 2001); Jim C., 235 F.3d at 1081-82; Stanley v. Litscher, 213 F.3d 340, 344 (7th Cir. 2000); Pederson v. La. St. Univ., 213 F.3d 858, 875-76 (5th Cir. 2000); Sandoval v. Hagan, 197 F.3d 484, 493-94 (11th Cir. 1999), rev'd on other grounds, 532 U.S. 275 (2001); Litman v. George Mason Univ., 186 F.3d, 544, 554 (4th Cir. 1999);

Clark v. California, 123 F.3d 1267, 1271 (9th Cir. 1997).  The

Commonwealth, by accepting federal funds, has waived its immunity.

The Commonwealth tries to avoid this result by arguing

that even after Congress has expressed a clear intent to require

waiver and a state has accepted federal funds pursuant to that

waiver provision, further proof may be required that a state

knowingly and voluntarily waived immunity.  We reject any such

requirement.  Further proof is not necessary under the law of this

circuit.[26]  To the extent that the defendants rely on reasoning in

two cases from the Second and Fifth Circuits, Garcia v. S.U.N.Y.

Health Sciences Center, 280 F.3d 98, 115 & n.5 (2d Cir. 2001); Pace

v. Bogalusa City Sch. Bd., 325 F.3d 609, 615-18 (5th Cir. 2003), we

reject this reasoning, as have three other circuits.  See A.W., 341

F.3d at 250-54; Doe v. Nebraska, 345 F.3d 593, 601-04 (8th Cir.

---

[26]    In any event, the Commonwealth's argument that its waiver
was unknowing and involuntary would fail even if such further proof
were necessary.  The Commonwealth argues that its waiver was
unknowing for two reasons: (1) Puerto Rico started accepting
federal funds before the Supreme Court's modern Eleventh Amendment
jurisprudence, which started in 1996 with Seminole Tribe v.
Florida, 517 U.S. 44 (1996), and (2) until the decision in Bd. of
Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356 (2001), it did not
know that it had a valid Eleventh Amendment defense to be waived.
But the acceptance of the federal funds relevant to the events in
this case (which started in August 2001) occurred after Garrett was
decided in February 2001.  And any possible issue of fair notice to
the Commonwealth was resolved by the 1986 enactment of § 2000d-7.
        The Commonwealth also argues that Puerto Rico needs
federal funds so badly that the waiver was not "voluntary."  But,
as we noted earlier, Puerto Rico may accept federal funding
elsewhere in its government while declining it for the agency
involved in this case.  This does not rise to the level of
compulsion.

2003); <u>Garrett</u> v. <u>Univ. of Ala. at Birmingham Bd. of Trs.</u>, 344 F.3d 1288, 1292-93 (11th Cir. 2003) (per curiam).

## IV.

We affirm the grant of the preliminary injunction and the denial of Eleventh Amendment immunity on grounds of waiver under § 504.  We remand the case with instructions to stay the claims under Title II of the ADA, and for further proceedings consistent with this opinion.  Costs are awarded to the plaintiffs.